KLOSE v. UNITED STATES.

LORENZ v. SAME.

STACK v. SAME.

Nos. 8884, 8888, 8890.

Circuit Court of Appeals, Eighth Circuit.

March 21, 1931.

Rehearing Denied April 24, 1931.

E. J. Brennan, of St. Louis, Mo., for appellant Klose.

William E. G. Watson and J. A. Mansfield, both of Minneapolis, Minn., for appellant Lorenz.

Lewis L. Drill, U. S. Atty., of St. Paul, Minn., and Lafayette French, Jr., Sp. Asst. to U. S. Atty., of Austin, Minn., for the United States.

Before STONE and GARDNER, Circuit Judges, and WOODROUGH, District Judge.

GARDNER, Circuit Judge.

Appellants will be designated herein as defendants. They were jointly indicted with certain others, for violations of sections 215 and 37 of the Criminal Code, 18 USCA §§ 338 and 88, in an indictment containing twenty-three counts. They, with other named defendants, were charged with having devised a scheme to obtain money and property by false pretenses in connection with the sale of stocks, bonds, and notes of the Volkszeitung Printing & Publishing Company, the Hardstone Brick Company of Duluth, Inc., and the Hardstone Brick Company of Little Falls, Inc., and that in carrying out such scheme the mails of the United States were used. The indictment is not challenged by either of the defendants, and it is stipulated in the record that, for the purpose of the appeals, it is admitted that the evidence was sufficient to prove beyond a reasonable doubt the device of a scheme to obtain money by false and fraudulent pretenses, as alleged in the indictment. While the defendants were tried together, each has prosecuted a separate appeal. The appeal perfected by the defendant William R. Stack was not followed by the filing of any brief, nor the presentation of any oral argument in this court and is deemed abandoned, and for that reason it is dismissed and will be given no further consideration. The defendant Klose, on his appeal, urges that: (1) It was error to deny his motion for change of judges; (2) that it was error to deny his motion for a mistrial, because of the prejudicial remarks of the assistant United States attorney and of misconduct of third persons with reference to the jury; (3) that the evidence is insufficient to establish beyond a reasonable doubt that he knew, or had reason to believe, that a scheme to defraud had been devised or that he participated in the furtherance of such scheme; (4) that the verdict was the result of passion and prejudice. The defendant Lorenz urges only error in the denial of his motion for a mistrial.

The indictment here involved is the same as that referred to in the opinion of the court in Cochran v. United States (C. C. A.) 41 F.(2d) 193. These defendants were not then tried, for reasons which are not clearly disclosed by the record. The defendant Lorenz was one of those who the government claims originally devised the scheme to obtain money by false pretenses, while the defendant Klose was a salesman who, it is claimed, with knowledge of the scheme, made or participated in the making of representa-

tions in the sales of stocks, bonds, and notes in furtherance of the scheme to obtain money by means of false and fraudulent representations. It having been stipulated in this case that the evidence satisfactorily established the fact that the defendants Cochran and Lorenz had devised a fraudulent scheme to obtain money by false pretenses, as charged in the indictment, it will not be necessary to review the evidence as to that issue, further than to say that it was substantially the same as that reviewed by this court in Cochran v. United States, supra, and the history of the case is there sufficiently set out.

The defendant Klose assigns error in denying his motion for a change of judges. This motion, not having been filed until the day the trial opened, was not timely presented, nor was it sustained by any affidavit showing facts or reasons for the belief expressed that the trial judge was biased or prejudiced; neither was it supported by a certificate of counsel that the application was made in good faith. Under the authorities the application was, therefore, fatally defective. Ex parte N. K. Fairbank Co. (D. C.) 194 F. 978; Henry v. Speer (C. C. A.) 201 F. 869; Berger v. United States, 255 U. S. 22, 41 S. Ct. 230, 65 L. Ed. 481; Lewis v. United States (C. C. A.) 14 F. (2d) 369; Nations v. United States (C. C. A.) 14 F. (2d) 507; Lipscomb v. United States (C. C. A.) 33 F. (2d) 33; Cuddy v. Otis (C. C. A.) 33 F. (2d) 577; Rossi v. United States (C. C. A.) 16 F. (2d) 712.

Toward the end of the trial in this case, which consumed some six or seven weeks, in the course of the direct examination of a witness for the defense, the following incident occurred: Paul Olson, a witness called on behalf of the defendants, was interrogated as follows:

"By Mr. Quinn (appearing for defendant Klose):

"My name is Paul Olson. I live in Minneapolis at 4510 Arden Avenue, South. My business is real estate. I was one of the defendants here in this indictment who was tried at a former trial.

"Q. Then was found not guilty by that jury?

"Mr. Anderson: I object to that as incompetent unless you want to show there were ten found guilty.

"The Court: It may be stricken.

"Mr. Watson: As to the defendant Lorenz I object to the remark.

"The Court: Both of the remarks may be stricken as to what happened in the former trial.

"Mr. Watson: It reflects on the credibility of the witness.

"The Court: There is no presumption of guilt.

"Mr. Quinn: I will withdraw the question and not urge it further if the court thinks it improper.

"Mr. Watson: I wish the record to show as to the defendant Lorenz, we ask the court to give more specific instructions as to the remark of Mr. Anderson regarding the guilt or innocence of the other defendants—regarding the prejudice of that remark on the defendant Lorenz.

"The Court: You may have an exception. The court does not wish to give any further instructions at this time."

In its charge to the jury, the court instructed as follows: "The only defendants here on trial are Arthur Lorenz, William R. Stack, and O. W. Klose and the only question before you is the question of the guilt or innocence of each of these defendants of the crimes charged. You have no concern with what has happened to the other defendants in this case. If any of you happen to know or think you know, the results of the former trial, you are to put those matters entirely out of your minds for they have nothing whatever to do with this case. Nor has the fact that any defendant pleaded guilty at the commencement of this trial any bearing on the issues in this case, and it must not be considered or discussed by you in reaching a verdict."

No exception was taken to these instructions, nor were any additional or other instructions requested on this subject. The defendant Lorenz does not urge this as error, but it is urged on behalf of the defendant Klose. As to him, it is observed that his counsel withdrew the question, took no exception, and said he would not urge the matter further. It is also to be observed that this was not assigned as error by counsel who tried the case, but was brought into the record on motion of the present counsel for the defendant Klose, on motion for leave to file in this court additional assignments of error. It is therefore doubtful whether the matter is preserved in the record or properly before this court. It was the defendant Klose who brought out the fact that the witness had been tried under this indictment at a former trial. This, as counsel must have known, was not material. Having himself

brought the matter out, he then sought to show that the witness had been acquitted. It is argued that this defendant was entitled to have his witness rehabilitated. If he had been in any manner discredited, it was the defendant Klose who did so, and apparently the only purpose of so doing was to enable him to get before the jury the fact that others indicted and tried on the charges involved had been acquitted. As the suggestion made by the assistant United States district attorney was to the effect that others had been convicted, it is difficult to see how this could possibly have been prejudicial; in fact, it would seem rather to have tended to rehabilitate the witness than otherwise. In any event, the defendant Klose, having himself brought this matter into the record, is not in position to allege error. There was no secret about the proceedings that had been had in this rather notorious case. The first trial had lasted some seven weeks. It was tried in a metropolitan city publishing many newspapers, and it involved a large number of defendants. The result of the first trial was a matter of public record, and it was a matter of common knowledge. It is not perceived how it could possibly have injured this defendant that the jury should have known that certain other defendants had been found guilty; in fact, the defendant Klose does not contend in this court that others were not guilty of the offense, but contends only that he was without guilty knowledge and that he acted in good faith. As was said by this court in Stewart v. United States, 211 F. 41, 48: "Under such circumstances, we do not think the court would be justified in holding that the fact disclosed by the District Attorney, presumptively already known to the jury, although involving a grave impropriety, was such as to necessarily work prejudicial harm to the defendant's cause."

As before observed, the matter sought to be elicited by counsel for defendant was not a material nor an issuable fact. If it had been, then proof might have been submitted as to how many of the defendants had been acquitted on the other trial, and if that were material, then, confessedly, the government should have been permitted to prove how many had been convicted, so that there was some provocation for the remark of the assistant United States district attorney, and it was apparently not prompted by sinister motives. The trial in the instant case was a long one, and the rights of the defendants seem to have been carefully guarded by the trial court, both in its action in striking the

remarks and in instructing the jury with reference thereto. The incident, though regrettable, did not constitute reversible error. Goodwin v. United States (C. C. A.) 200 F. 121; Robbins v. United States (C. C. A.) 229 F. 987; Myers v. United States (C. C. A.) 223 F. 919; Echikovitz v. United States (C. C. A.) 25 F.(2d) 864; Pollock v. United States (C. C. A.) 35 F.(2d) 174.

It is urged on behalf of both the defendants Klose and Lorenz that they were prevented from having a fair and impartial trial by reason of certain irregularities in connection with one of the jurors. During the trial, the jurors were kept in the custody of the United States marshal, but at the close of the testimony, certain of the jurors, including one Denzer, were taken into a barber shop in St. Paul about 6 o'clock on the afternoon of December 15, 1928. This juror was attended by a barber named Roston, who attempted to engage him in a conversation with reference to the trial. It is the claim of the defendants that during the time Roston was cutting the juror's hair, it was agreed that the barber would approach the defendants and submit to them a proposition whereby, in consideration of a sum of money to be paid by defendants, the juror would vote and hold out for an acquittal. Following this alleged conversation, the barber communicated with the defendant Klose and offered to make arrangements by which, through him, a sum of money should be paid for the purpose of influencing the juror. The United States district attorney in charge of the prosecution and the trial judge were notified by counsel for the defendants. Thereafter, pursuant to the direction of the court, one of the attorneys for the defendants accompanied by an operative of the United States Department of Justice, sought to test the truthfulness of the story told by the barber, by offering the wife of the juror $150, the barber having claimed that he had arranged with the juror to pay the juror's wife, and that she would come into the courtroom and give the juror the "sign," or otherwise communicate with him, showing that arrangements had been made. The juror's wife, however, refused to accept the money, but instead the following day called upon the trial judge and told him what had occurred. She was then advised by the court that the offer had been made to her under the order of the court. In the meantime, the juror was taken seriously ill, as conclusively shown by the testimony or certificates of three physicians, and he was removed to a hospital. The wife asked permission to visit her husband

at the hospital, which request, no objection having been interposed by counsel for the defendants, although personally present, the court granted with the admonition that absolutely nothing be said by her to her husband with reference to this incident, and with the promise on her part that nothing would be said about the matter. We must assume, especially in view of her conduct in connection with this incident, that she was of such character as to warrant the court in trusting her to obey this admonition, and there is nothing to indicate that it was violated. It thus appears that diligent efforts were made to expose any misconduct on the part of the juror, but no corroboration of the barber's story was had. The barber called upon the judge who presided at the trial, and the judge states: "I haven't the slightest doubt in my own mind as to the honesty of this juror (Denzer), who has been mentioned in the newspapers. Furthermore * * * I was called up by Roston, who asked permission to come out and see me at my house. I told him to come up. He came up and sat down and told me that so far as this juror having discussed this case with him, there was absolutely no truth in it whatever; that all that transpired was this: Mr. Denzer sat down in this barber's chair, and that he was told by him, by the juror, that he lived near Rosemount; that he was a farmer; that he was on the jury; and Mr. Roston says that he had had some difficulty himself in a criminal charge, and he said he had sympathy for those that were in the situation that the defendants were in this case, and that the juror said that probably was true, or words to that effect, but that he could not discuss the case, and that that was all that transpired. * * * I am absolutely satisfied that there was no conversation between this man and the juror whatever with regard to this case. Nothing of a prejudicial character happened, and I see no use of presuming, or no occasion to presume that anything prejudicial could have resulted from anything that transpired in connection with the case. * * * Of course, all that was said was purely hearsay. * * * I have given the matter a great deal of consideration, and I am satisfied in my own mind that if any prejudice could be shown that it would be a matter which could be better taken care of upon a motion for a new trial and an opportunity for investigation than it could be otherwise."

As remarked by the trial judge, the entire showing was based upon hearsay. Roston, the barber, communicated with Klose,

Klose communicated with counsel for defendants, and counsel alone made affidavit. So far as the showing purported to reflect anything the juror is alleged to have said, it was hearsay upon hearsay. On the other hand, it appears from the record that the trial judge interrogated Roston personally and got from him first-hand what he had to say about the incident. It is not claimed that the misconduct was the result of any corrupt or improper influence practiced on the part of the government, nor that any one connected with the trial of the case was in any degree responsible for the unfortunate incident or guilty of any reprehensible conduct with reference thereto. Courts should not and will not tolerate any attempt to tamper with juries, and where the misconduct of a juror has been participated in by the prevailing party, it should be presumed that prejudice resulted from the misconduct, but where, as in this case, it clearly appears that the prevailing party did not participate in nor have any knowledge of the alleged misconduct, then the question confronting the trial court was whether or not the facts would warrant a finding of prejudice. Whether this juror had been guilty of misconduct, or had been subjected to improper influences affecting his verdict, was a fact to be determined by the trial judge. The trial judge concluded that the juror was blameless, that he had refused to discuss the case with the barber, and that the barber was merely attempting to create a situation where he might blackmail the defense. It is the duty of the trial judge to maintain the integrity of trials by jury, and if it appears at any stage of the trial before verdict that misconduct of any juror or other person has tainted the panel with any sort of corruption, or intimidation, or coercion, the trial should be stopped and a mistrial granted. United States v. Russell, 255 U. S. 138, 41 S. Ct. 260, 65 L. Ed. 553; Mattox v. United States, 146 U. S. 140, 13 S. Ct. 50, 36 L. Ed. 917; Sunderland v. United States (C. C. A.) 19 F.(2d) 202. Yet, it does not follow that a mistrial should be granted whenever any evilly disposed person in no way connected with the parties, attempts to make improper remarks or advances to a juror, or attempts to corrupt a juror. Such a rule might preclude bringing any desperate offender to justice. Without any expectation or hope of success in such an attempt, it might readily be resorted to as a means of thwarting the administration of justice. There was no abuse of discretion by the trial court in denying a mistrial, and no prejudice has been

shown by reason of this alleged misconduct and irregularity.

 It is further contended that the defendants were prejudiced because of the great publicity given in the newspapers relative to the alleged jury tampering. There is nothing in the record to show that any of the jurors read either of the papers containing the objectionable articles, and such publicity as the incident received was apparently due to the acts of the defendants or their counsel. It is not observed that the objectionable publicity contained any misstatements or false charges, nor did it contain anything calculated to intimidate jurors or obstruct justice. At the beginning of the trial, the court cautioned the jury not to read any newspaper articles concerning the trial, and there is no evidence that the jury violated this admonition. In addition to this, the court, after the publication of the objectionable articles, further admonished the jury as follows: "You recall, gentlemen, that at the commencement of this trial I requested you to refrain from reading articles in the newspapers referring to this case. During any long trial such as this is, it frequently happens that there are remarks made, gossip, and sometimes accusations made by persons, who are not interested in the case, which it is believed may have some tendency to cause prejudice or feeling, and it frequently happens that those matters get into the newspapers. I have done all that I felt was reasonably possible to protect you gentlemen from any possible influence. I regret to state that there have been published recently in some of the papers, articles referring to the case, which if not properly understood might cause some difficulty. I hope that none of you have read those articles, but if any of you have, I want to tell you now not to discuss them with the other jurors, not to consider them in any way, and to entirely disregard and put them out of your mind. I will say to you that there is nothing which has transpired during the trial of this case which would justify any conclusion that anything wrong or improper has been done by any of the defendants or their counsel, or by any of the government officers or employees or by the attorneys for the government; and I can further state to you without any qualification whatsoever that there is nothing which has occurred which has reflected in any way upon the honesty and integrity of any of the jurors in this case."

The matter is again referred to in the court's instructions by which the jury were directly instructed to disregard the newspaper articles, if any of them had read them. It should be observed in passing that the motion for mistrial did not include the claim of prejudice because of the publicity given this incident; but quite aside from this fact, we are of the view that there is no foundation for the claim that prejudice resulted therefrom. Stunz v. United States (C. C. A.) 27 F.(2d) 575; Myers v. United States (C. C. A.) 223 F. 919; Itow v. United States (C. C. A.) 223 F. 25; State v. Morris, 58 Or. 397, 114 P. 476.

 There remains for consideration the question of the sufficiency of the evidence which is raised only by the defendant Klose. This question is limited to the inquiry: (1) Did the defendant Klose know of the scheme to defraud, and (2) did he aid in any substantial way in its execution? In instructions which are not challenged on this appeal, the court charged the jury that: "The gist of the offense, that is an essential element of it, is the prosecution of a fraudulent purpose, toward the execution or fulfillment whereof the mail is used. One man may form and accomplish it, with or without assistance, but all who with criminal intent join themselves even slightly to the principal schemer are subject to the statute, although they may know only their own share in the aggregate wrongdoing. The law is that 'whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces or procures its commission, is a principal.' So that whoever knowingly aids, abets, counsels, commands, induces or procures the doing of any act constituting a violation of the statute in question is just as guilty as the principal schemer."

Again the court said in its instructions: "Any defendant who knew that the enterprise was one for obtaining money or property by false and fraudulent pretenses, representations or promises, and who aided in any substantial way in the execution of it—that is, helped in any way to carry it on—is guilty if the letters set out in the indictment, or some of them, were mailed in execution of it by one of his associates in the unlawful scheme. So you must ask yourselves this question as to each defendant: Did he become a participant in this scheme; did he aid in devising it or in its execution, knowing its character?"

Again the court said: "Where two or more persons jointly devise and execute a scheme to defraud by the use of the mails, they may thereby become in effect partners in the criminal purpose. If they do, the acts of each thereafter during the existence and

execution of the scheme, done in furtherance of that execution, may become the acts of all the partners, and each may be convicted of the mailing of a letter which one of his partners caused to be mailed."

By these and other instructions it was made clear to the jury that to warrant a conviction of any defendant, it must appear to their satisfaction beyond a reasonable doubt, not only that a fraudulent scheme had been devised, and that the mails had been used in connection with its execution, but that the defendants were criminally connected with it, either as principal, or aiders and abetters. While the stipulation relieves us of the necessity of reviewing the evidence, which it is admitted, satisfactorily establishes the formation of a fraudulent scheme to obtain money by false pretenses, it is, nevertheless, important to have in mind the character of the fraudulent scheme and the various methods employed in its execution, because the evidence going to prove these facts is of such a character as to mark the enterprise as unusual and such as not only to give notice to any right-thinking person that the enterprise was not a legitimate one, but to shock the sensibilities of any business man entertaining ordinary ethical standards of business.

It appears from the evidence that the defendant Klose was in constant communication with the promotion headquarters of the Volkszeitung Printing & Publishing Company, and that there issued from that office, letters and advertising matter similar to that referred to in our opinion in Cochran v. United States, supra. He received, directly or indirectly, from the moving spirit, Cochran, the instructions and rules which should govern the activities of the salesmen, and these themselves were of such a character as to mark the enterprise as inherently fraudulent. Cochran instructed his salesmen to go out and get the money; that it didn't make any difference how they got it, and that "he would take care of the squawks." These salesmen knew that they were all working under and pursuant to a promotion scheme. The projects promoted were not such as are ordinarily owned or operated by a printing and publishing company, but were entirely foreign to the ordinary activities of any such company, and it was apparent that the paramount activity and business of the Volkszeitung Printing & Publishing Company was not the operation of any legitimate business, but that it was promoting the sale of various securities. Among its advertising matter were some beautifully lithographed circulars, relating to the two apartment houses which, with the Volkszeitung building, constituted a large part of its physical properties. These properties were old structures, built in 1886 and 1888, were mortgaged for $275,000, which was more than they were worth, and yet there was placed on sale these gold notes of the company aggregating in amount $1,000,000; and in these circulars these apartments, the Alexandria and the Piedmont, were stated to be valued at $308,621 and $357,760, the net annual income was stated to be $33,024.13 and $44,256, respectively, while the testimony indicated that for the years 1926 and 1927 these properties had been operated at a net loss.

Prior to the date of the offenses charged in the indictment, Klose had operated in Wisconsin, and he knew that the sales made by him and his associates were disapproved by the Wisconsin Securities Commission, not only because they were made without authorization, but because of the character of these securities, as it appears that the Wisconsin Commission required that the money received for these securities be refunded to the Wisconsin investors. His contract with this concern was itself a badge of fraud. By its terms, he was advised that Cochran was selling gold notes of the Volkszeitung Company which matured in twelve months and bore interest at seven per cent. Out of the proceeds, Klose was to receive ten per cent., and in the event that he sold $60,000 in six months, he was to receive an additional bonus of $5,000. On this basis, the net cost to the Volkszeitung for obtaining the use of $60,000 for one year would be $15,200, made up of $4,200 interest, $6,000 commission, and $5,000 bonus, or 25 per cent. every twelve months, and in addition to this, Cochran was entitled to a commission of 5 per cent., although Klose may not have known this. A man of such intelligence as Klose must have known that no legitimate business could pay any such premium for funds, nor would any legitimate business have been required to pay such a premium for working capital. He said to the witness Pollman that he did not know what Cochran was doing with the money, and he expressed doubt whether the concern would survive twelve months.

These gold notes were being so issued as to evade the Minnesota Securities Act Law (Minn. St. 1927, § 3996-1 et seq.). The Security Commission having stopped the sale of bonds and having refused to issue permit for the sale of these securities, it was found that the commission did not have jurisdiction of securities which matured in less than

two years. Thereupon this concern issued notes payable in eighteen months. The law was then so changed as to give the commission jurisdiction of the sale of securities maturing in fifteen months, and thereupon the form of the notes was again changed so as to be payable in twelve months. In fact, the entire proceedings of this outlaw organization smacked of corruption.

With the acquisition of the Volkszeitung publication and the Stats Tidning publication, Cochran and his associates had access to the subscription lists, that of the Volkszeitung being made up largely of Germans, and that of the Stats Tidning being made up of Scandinavians, and it was known to these salesmen that the German subscribers were being sent letters and printed circulars in the German language, recommending these securities, because of the Germans' confidence in the Volkszeitung which had been published for many years. Other devices were employed to prey upon the credulity of the subscribers to the Stats Tidning, by representing a proposed enlargement of the field of activity and influence of that publication. These lists were made up very largely of aged, thrifty people, whose credulity was subtly preyed upon through various devices and falsities resorted to by high-pressure salesmen, among whom Klose seems to have been one of the most artistic and successful. Among the printed matter sent out to these subscribers are found the following expressions: "The Volkszeitung existing for over forty years, is one of the most flourishing enterprises in the entire state. More than two hundred thousand copies of our paper leave our large presses every week. In addition to our known place of business we have acquired during the last few years the Piedmont Hotel and the Alexandria Apartment. The valuation of the Piedmont is estimated at $357,000 and the Alexandria at $308,000. * * * Please do not let this opportunity pass by but invest your money in first class security and at a high rate of interest. Your own interest should cause you to invest your money where it is insured against loss and where you don't have to be satisfied with three or four per cent. Absolute safety— seven per cent."

In another circular, printed in the German language, appears the following: "As we have been in business over fifty years and enjoy the best reputation of the entire state, it is self-evident that we are careful to recommend to our readers only such investments which exclude all loss. This is particularly true of our gold notes which are insured through valuable real estate in the best parts of St. Paul. Recently we sent you some printed matter describing the real estate and the business enterprises which are controlled by the Volkszeitung and which are turning in such good returns that it is possible for us to give our readers seven per cent. interest, which is a high rate of interest under present conditions. Absolute safety and good interest will also be our business principle in the future in our intercourse with those of our readers who have invested money with us."

From another of these circulars, we quote the following: "You and your wife may depend upon it that we will not recommend an investment to you through which our German readers would lose their money. Everyone of our readers is in a similar position, having saved a few thousand dollars through a life time of hard work and we do not wish to burden our German conscience and be responsible for the loss of the few cents they have saved up for their old age."

The salesmen knew that they were soliciting the subscribers to these foreign language papers; they knew of the cooperation they were receiving from the entire organization, the only purpose of which was to sell to a confiding constituency of these newspapers these various worthless securities. The witness Pollman, who was associated with Klose, says: "The system followed there in the office was if a team had a good prospect and they could not close him, I was told to go to Mr. Lorenz and to ask him to write a letter in German to our prospect, and give him the facts, and he would do so, and then, if necessary, to ask him to accompany me to this particular prospect, to try to close him, with him present. Mr. Cochran told me this. I consulted with Mr. Lorenz, and asked him to write letters for me. He did so on one or two occasions. I would give Mr. Lorenz the information; the name and address of the prospect; the amount of money, where he had it, and how he had it, and if possible, to close the deal for a certain amount of it, or all, if we could get it all, and then, after Mr. Lorenz had written these letters, I would again go out to call on the prospect."

Pollman also testified that on numerous occasions he had discussed with Klose the statement of Cochran that they were to go out and get the money in any way they saw fit, and that he (Cochran) would take care of the "squawks."

Before passing to the representations made by Klose, it is observed that he stated to his associate Pollman that he wanted to stay

long enough to get $10,000, and then he was quitting and getting out of it; that he did not know what Cochran was doing with the money. With this wholly inadequate presentation of the background, we turn to some of the representations made by Klose. In practically every instance he represented that an investment in these gold notes was absolutely safe. He also represented that they were amply secured; that the company was making 170 per cent.; that these notes were a lien on the company's property, including the apartment houses, lithographic pictures of which were shown, no disclosure being made that these properties were already bonded for $275,000; that the company was borrowing only $30,000, without disclosing that it had already issued bonds for $275,000 and was issuing gold notes in the aggregate amount of $1,000,000; that the company and its various properties, including its brick factories, hotels, and apartment houses, were all making big money; that the company "was awful rich"; that an investment in these gold notes was one of the safest investments that could be made, much safer than the Northern States Power bonds, and that if one invested in his company he would not have to worry about its being safe, and that it would be wise to transfer Northern States Power bonds for these gold notes; that there was plenty of security back of them. One of the victims testified with reference to her purchase, among other things, as follows: "They (Klose and his associate) said they did not need the money; they could get it elsewhere, but they wanted to give the subscribers a chance, and they would not renew the note after it once came due; it would not be renewed, but I would get my money back. He said only the old subscribers to the Stats Tidning could invest. They don't want anybody else's money. He said it is perfectly safe; the Volkszeitung Printing and Publishing Company was a perfectly safe company."

In practically every instance Klose assured the prospective purchaser that the investment was perfectly safe and amply secured. A German widow lady testified as to her conversation with Klose, resulting in her purchase of some of these notes, as follows: "Of course, when he told me, then I thought it was pretty good, if I got my thousand dollars back, and I said, 'Yes, I would do that,' and finally I said to him, 'Don't take this money from me if it ain't safe; that is all I got; it is my husband's insurance money,' I told them. He says, 'Oh, it is safe; you don't need to worry about

that; I got an old mother, and I would not do a thing like that.' And he says, 'I don't need to worry; it was as safe as anything in the world, that money, and I get it back in a year.' * * * I asked him, I says, 'Can you swear that this money is safe?' He says, 'I will swear to it, by the life of my boy, that the money is safe,' and I finally did give him the papers, and I says, 'Leave this money until I get my interest on it next month, the 20th of July.' He says, 'No, I will give you the interest,' and he made out a check, and he made out a gold note for me for the whole amount of money the same day."

The surviving widow of a minister of the Swedish Lutheran Church was induced by Klose to invest in these gold notes. She had money invested in the preferred stock of the Northern States Power Company, and Klose advised her that the stock was not worth more than 30 cents on the dollar. She testified, among other things, as follows: "He took out his wallet, and showed me these pictures of the Piedmont and the Alexandria. He said that they had invested their money there, and he showed me those big apartments, and those big buildings, and told me all about them. Mr. Klose said they were making forty per cent. on this investment in those buildings. * * * I told Mr. Klose that I was a widow, and that I was working hard for my living, and so I said, 'I did not want to invest anything unless I know that it is safe.' He said, 'Well, I am a widower, and I have two boys,' and he knew what it was to be left that way. And then he showed me pictures of his boys, and he seemed to be very kind and sympathetic. * * * He said about how safe it was, that it was much safer in this company than in anything else."

An old gentleman seventy years of age, of Swedish extraction, who had been a subscriber to the Stats Tidning for forty years, at the solicitation of Klose invested $7,000 in these gold notes. He was told that the Volkszeitung Printing & Publishing Company had been printing the Stats Tidning for twenty years; that they had bought it and were planning to start an English paper, and for that reason needed money to buy additional printing presses and other printing equipment, and they had decided to give the subscribers of the Stats Tidning a chance to make a safe and profitable investment of their money, and that they would not accept any funds from anybody other than the subscribers of the Stats Tidning. This witness, among other things, testified: "And in the conversation he represented that that investment would be very safe and profitable, bear-

ing seven per cent. interest, payable quarterly, and there was nothing safer. * * * When I made my first investment, Mr. Klose said that I could get it back any time I wanted it, and other times he said I could get it back any time I needed it. And he also said, 'If you need money, don't hesitate to let us know. All you have to do is to write down to the office and your money will be forthcoming. * * *' He said about the same thing every time he was there, how safe it was, and how it was secured by valuable St. Paul real estate, and he made reference to this building, the Alexandria building, the Piedmont building, and the Volkszeitung building and equipment. * * * I also asked him about the success of the business in general, and he said, 'The business is growing fine.' He says, 'The Volkszeitung Printing and Publishing Company are doing a fine business, and they are successful and making good money,' and that was what led me to make this additional investment."

The foregoing are simply typical of the representations made. The sales talks employed by Klose were enriched by most extravagant and wholly false statements which may not have gone directly to the issues, but indicate a reckless disregard for the truth and a determination to follow the advice of the master mind directing this fraudulent scheme, to "get the money anyway you can." Other faithful Swedish subscribers to the Stats Tidning were told of the proposed and wholly mythical plan of developing that publication and of employing an eminent educator widely known to the subscribers of the papers, as its editor, and to the German subscribers he told equally seductive stories, appealing to their sentiment or clannishness. He did not take the witness stand, but his counsel claim in his behalf that he acted in good faith and that he had made a careful investigation of the financial affairs of the Volkszeitung and relied thereon. We are not impressed with the suggestion that he could possibly have acted in good faith. He said so many false, extravagant, and unwarranted things aside from those claimed in the indictment, that it is difficult to clothe him with a mantle of good faith. His remarks to Pollman contradict any such contention, and his entire conduct smacks of fraud and corruption. The evidence with reference to his so-called investigation of the affairs of the Volkszeitung shows that he was told that there was an issue of bonds of $275,000. The witness said: "I explained to him that the note holders would come in after the bond holders, that is, what was left after the $275,000 worth of bonds had been satisfied. I said that the profits from the First Investment Company were to come in there. He did not ask me if I had received any profits from the First Investment Company. Then I told him the profits from the sale of brick machinery. He did not ask me about the amount of gold notes that had been sold up to June, 1926, nor what the money that he was bringing in for the sale of gold notes was being used for, but he understood that."

Concerning the so-called financial statement given to Klose, and which his counsel greatly stress, the secretary-treasurer of the company testified that she did not know who made it, and that she did not furnish it to Klose as being a statement of the condition of the Volkszeitung. It is observed that Klose was specifically told that the note holders came after the bond holders, "That is, what is left after the $275,000 worth of bonds had been satisfied." Had he been seriously attempting to ascertain the financial condition of this company, he should have inquired as to the amount of profits being earned, the amount of gold notes being sold, and the purpose for which the money was being used. There was $275,000 worth of bonds outstanding against the properties of this company, yet in all his representations he either directly represented, or left his victim to infer, that the property of the company was all free from incumbrances, and that these notes were a first lien thereon. We think substantial evidence abundantly proves that Klose participated in this gigantic fraud, and that he was one of Cochran's most efficient lieutenants and co-workers. To permit these shocking frauds, leaving wrecked fortunes of numberless honest and confiding people in their devastating pathway, to go unpunished, on the flimsy excuses urged in behalf of these defendants, would be a travesty on justice and place a premium on artistic villainy and rascality.

The judgments are therefore affirmed.