**CURRIN et al. v. NOURSE et al.***

**In re GENERAL UTILITIES CO.**
No. 10001.

Circuit Court of Appeals, Eighth Circuit.
Nov. 26, 1934.

*Rehearing denied Jan. 12, 1935.

274

William B. Bostian and Floyd E. Jacobs, both of Kansas City, Mo. (James A. McDermott, of Winfield, Kan., and Horace D. Payne and Thomas E. Deacy, both of Kansas City, Mo., on the brief), for appellants.

Roy B. Thomson, of Kansas City, Mo. (I. P. Ryland, Paul R. Stinson, Arthur Mag, and Robert E. Rosenwald, all of Kansas City, Mo., on the brief), for appellee Stern Bros. Inv. Co.

William G. Boatright, of Kansas City, Mo. (Ringolsky, Boatright & Jacobs, of Kansas City, Mo., on the brief), for appellee Brown-Strauss Corporation.

Ben L. Shifrin and Taylor, Mayer & Shifrin, all of St. Louis, Mo., for appellee Jacob Lasky.

Louis Mayer and Irl B. Rosenblum, both of St. Louis, Mo., for appellees J. J. Rubenstein and United Bank & Trust Co.

Frank P. Barker and. Winger, Reeder, Barker & Hazard, all of Kansas City, Mo., for appellee Wheeler Kelly Hagney Trust Co.

Forest W. Hanna, of Kansas City, Mo., for appellees Allen E. Lonston & Co. et al.

James B. Nourse, of Kansas City, Mo., trustee, pro se.

Before .GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

WOODROUGH, Circuit Judge.

This is an appeal by certain unsecured creditors of the bankrupt General Utilities Company from an order confirming the sale of the assets of the bankrupt estate to Stern Bros. Investment Company. The sale in question was made February 8, 1933, and was on that date confirmed by the referee. A petition for review was filed and on March 21, 1933, the District Court confirmed the sale (Judge Otis sitting). Thereafter an appeal to this court was taken from the order of confirmation by the same parties who now prosecute the present appeal. On considera-

tion of the former appeal, this court expressed no opinion as to the validity of the sale, but reached the conclusion that there had been an abuse of power by the referee in that he had denied the unsecured creditors an opportunity to be heard fully upon the question of the approval of the sale, and that the parties should be restored to the position which they occupied prior to the confirmation of the sale by the referee on February 8, 1933. The case was remanded with directions that the unsecured creditors be given a full and fair opportunity to be heard upon the question of the confirmation of the sale. (C. C. A.) 66 F.(2d) 137. After the remand, notice of hearing on the matter of confirmation was given and hearings were had before the referee extending over several days, in the course of which the trustee was examined and testified at great length and much testimony claimed to have a bearing on the. question of the confirmation of the sale was offered and heard by the referee. After the hearing before the referee and on September 15, 1933, the referee again ordered confirmation of the sale to Stern Bros. Investment Company, finding that the sale was in all respects fairly made and for the best price and upon the best terms available to the trustee. After the referee had for the second time confirmed the sale to Stern Bros. Investment Company, the unsecured creditors petitioned the District Court for review and also applied for a re-reference to the referee on the grounds that the referee had failed to make a proper summary of the evidence and for the purpose of correcting or supplementing the record. It was also represented to the District Court, among other things, that since the date of the hearing, the petitioners had caused a certain report and valuation of the properties, which was in the course of preparation during the hearing before the referee, to be finally completed, and that "one McKee of Brokaw, Dixon, Garner & McKee, geologists and engineers enjoying a national reputation, * * * stated that * *. * a cash bid for these properties would be made upon the report and valuation" and "that said McKee was of the firm opinion that the said bid would be a cash bid, would be a cash offer substantially greater than the bid of Stern Brothers Investment Company." It was also alleged that "an offer to purchase has been prepared and it is desired to submit this to the referee on re-reference of this cause. This offer to purchase is for a cash consideration of $300,000.00 * * * it is signed by George McBlair."· On the hearing before

District Judge Otis, he found that the referee had sent up with his certificate to the District Court a complete transcript of all the testimony taken at the hearing before him, including approximately 1,000 pages of testimony, but acceded to the complaint that the referee had not certified to the judge a summary of the evidence relating to the questions presented in conformity with General Order in Bankruptcy 27 (11 USCA § 53). The court ordered the referee to make summaries in accordance with the rules, and also ordered the referee to hear evidence on the question whether there was then any prospective bidder ready to make a better cash offer than that of the Stern Bros. Investment Company.

Upon the re-reference so ordered and on December 20, 1933, a further hearing was had before the referee, at which hearing George McBlair was the only person appearing for the purpose of making any offer or proposal to bid. He filed a written document entitled "Offer of George McBlair to purchase property of General Utilities," which was analyzed and compared by the referee and found to be no better bid than that of Stern Bros. Investment Company. On December 23, 1923, after this hearing before the referee, George McBlair filed an affidavit of prejudice in the District Court charging that Judge Otis had personal bias and prejudice against him and the unsecured creditors for whom he was attorney in fact, and, thereafter, on December 26, 1933, an affidavit in very similar terms and for the same purpose was filed by one U. S. Hannum, a general creditor of the estate in the sum of $2,000.

Motions to strike the affidavits as insufficient in law were sustained and Judge Otis reviewed the order of the referee confirming the sale for the second time and sustained the findings and conclusions of the referee and confirmed the sale. On this appeal from the final order of Judge Otis it is presented that there was error in striking the affidavits of bias and prejudice and in the refusal of Judge Otis to hear additional oral testimony offered at the hearing upon the petition to review the referee's order of confirmation and the exceptions and objections taken to the action of the referee and that there was error in refusing to sustain the various exceptions and objections to the action of the referee and his confirmation of sale.

We consider first the question whether Judge Otis properly retained jurisdiction of the case. It appears that each of the affidavits of bias and prejudice presented to him contained what purports to be a certificate of counsel signed by one Horace D. Payne, describing himself therein as counsel of record for the affiant to the effect that "he prepared the document and is informed as to the proceedings," and he certifies "that the affidavit and application for the designation of another judge are made in good faith and not for the purpose of delay or hindrance of the proceedings." At the hearing of the motions to strike the affidavits, testimony was offered that the said Horace D. Payne was not a member of the bar of the District Court for the Western District of Missouri on or before the times when the affidavits and certificates were made or filed and, thereupon, the said Horace D. Payne, being present before the court, admitted that he had never been enrolled as such member of the bar of the federal court for the Western District of Missouri at the times the affidavits and the certificates were made or filed. The section of the applicable statute (section 21 Judicial Code, title 28 USCA § 25) provides that "no such affidavit [an affidavit of bias and prejudice] shall be filed unless accompanied by a certificate of counsel of record that such affidavit and application are made in good faith." The phrase "counsel of record" in the statute means an attorney at law admitted to the bar of the court who has been counsel of record in the case. One who is not a member of the bar cannot be counsel of record even though the record on its face may show he had undertaken to appear as counsel. Since Mr. Payne was not on the date of the filing of either of the affidavits a member of the bar of the court, he could not then or at any earlier time have been counsel of record in the case for either of the affiants. The purpose of the provision of the statute requiring certificate of good faith by counsel of record is that the court may be assured that the affidavit is made in good faith through the certificate to that effect made by one who is a sworn officer of the court, regularly admitted as an attorney to practice at the bar of the court. The requirement is not technical. It is one of the essential requirements of the statute. As the affidavits were not certified to be made in good faith by counsel of record, the motions to strike them for insufficiency in law were properly sustained and Judge Otis "having," as he stated, "no consciousness whatever of any prejudice against any of the parties or in favor of any," the duty to continue with the hearing on the mat-

ter of confirmation of the sale remained upon Judge Otis. Klose v. United States (C. C. A. 8) 49 F.(2d) 177; Cuddy v. Otis (C. C. A. 8) 33 F.(2d) 577; Morse v. Lewis (C. C. A. 4) 54 F.(2d) 1027; Saunders v. Piggly Wiggly Corp. (D. C.) 1 F.(2d) 582; Benedict v. Seiberling (D. C.) '17 F.(2d) 831; Ex parte Fairbank Co. (D. C.) 194 F. 978.

Passing to the matter of the confirmation of the sale, we take up the assignments of error based upon the claim that the trial court erroneously refused to receive testimony offered in opposition to the confirmation of the sale at the hearing had on February 2, 1934. The record discloses that on that date the case came on for hearing before the District Judge on the report of the referee confirming sale and the exceptions thereto, and the court declared that he would not then accord a trial de novo nor receive further evidence. Some forty-one separately stated and numbered offers to prove by oral testimony were thereupon made, and refused by the court.

It appears from the record, however, that before the case reached this point when the court declared that he would not receive evidence, the referee had accorded all parties interested in the sale or purchase of bankrupt's assets full opportunity to be heard; that the unsecured creditors had availed themselves of the opportunity; and that a thousand pages of testimony had been taken; all of which was before the trial court at the hearing on the report of the referee and the exceptions. It also appears that the trial court had heard applications for re-reference and that the referee, upon such re-references, had heard additional testimony.

The offers to prove are before us and have been examined. The witnesses from whom the oral evidence was proposed to be elicited were the trustee in bankruptcy and one Anderson, who had been long connected with the bankrupt estate, both being witnesses who had been at all times available to the unsecured creditors, the trustee himself having been on the witness stand for several days. We find nothing in the circumstances under which the proposed testimony was obtained or in the testimony itself to require the trial court to hear or consider it at the time it was offered. None of it tended to establish that there was any reason to believe that any responsible bidder had been or could be found who would pay more for the assets of the bankrupt than Stern Bros. Investment Company. Although it was the intention of this court, clearly expressed in the former opinion, that all parties should have a right to be heard in respect to confirmation of the sale, it was not intended that the orderly procedure by original trial before the referee with review in the District Court should be abrogated or that the case should in all stages be for trial de novo.

The trial court properly proceeded to pass upon the order of confirmation of sale and the exceptions and objections thereto and the proceedings and evidence certified therewith. None of the assignments of error based upon the refusal to hear the offered testimony at that time is sustained.

As the matter of the bid of George McBlair was brought into the proceedings after the referee had made and reported his second confirmation of sale, we next consider the assignments of error assailing the findings and conclusions concerning that bid and its rejection. The evidence is that Mr. McBlair was chairman of a committee constituted to represent a large number of the unsecured creditors of the estate and that he had been very actively concerned in the bankruptcy administration of the estate throughout, and was informed as to the assets of the bankrupt and the conduct of the administration by the receivers and the trustee, including the attempts of the trustee to sell the assets and of various persons to acquire them. The record discloses no bid or proposal from him until he submitted his written offer before the referee on December 20, 1933, more than ten months after the assets had been sold to Stern Bros. and the sale confirmed. The fact that Mr. McBlair was desirous of making a bid was first brought to the trial court's attention on November 6, 1933, after the referee had confirmed the sale to Stern Bros. the second time on September 18, 1933. The court said:

"The application for re-reference sets out that if a re-reference is granted proof may be made that a substantially 'larger amount might be realized for the assets of the bankrupt than will be realized under the sale to Stern Bros. Investment Company. A large majority of the general creditors appear to believe that the amount bid by Stern Bros. is inadequate and that the properties are worth much more and can be sold for much more. * * * It is set up in the application for re-reference that a showing can now be made of two really cash offers for the assets of the bankrupt. One of them is described as an offer to purchase for 'a cash consideration of $300,000.00' (the McBlair

bid). Another is described as a cash bid by one Butterworth of an amount of $350,000.00. These promised showings are described in the application for re-reference as newly discovered evidence. * * * A belated and new cash offer now made might not in any event justify the setting aside of the referee's order of confirmation; * * * if there is really a prospective bidder who stands ready now to make a cash offer substantially greater than that of Stern Brothers this court desires to know it."

The order of the court was that the referee should hear such evidence as may be submitted to him tending to prove that substantially larger cash offers for the assets of the bankrupt were made than that made by Stern Bros. Investment Company. Accordingly, re-reference was made and further opportunity to submit bids before the referee was given and McBlair presented his bid. The referee had made the requirement, which we find to be reasonable, that the amount required to be deposited with proof of any bid should be $50,000 in cash or certified checks (this sum having also been required as a deposit from other bidders), to be forfeited in case the bidder failed or refused to comply with the terms of his bid in the event of acceptance and confirmation of sale to such bidder. Instead of depositing such cash or certified check as required, Mr. McBlair deposited an assignment of allowed claims against the bankrupt estate of the face amount of $19,800, neither of which claims were cash or the equivalent of cash, and a check for $15,000. The check was conditioned by indorsement that payment was to be made only if, as, and when the offer to purchase by George McBlair is accepted and properties bid upon conveyed to McBlair. The bid of McBlair contained specific reservations of bidder's right to deposit liens or administrative claims in part payment of the purchase price. It also specifically excepted from inclusion in the offer to purchase parcels of property covered by certain lien claims, some allowed and some then pending allowance. The bidder offered to purchase only a part of the property covered by particular liens and excluded the remainder of the property covered by the same lien in certain instances. The McBlair bid, after reciting that certain credits on account of net earnings of the property should accrue to him on his bid as a result of specifying a certain cut-off date, stated that his information was that such total accruals amounted to $71,000. Mr. McBlair did not offer testimony to establish that net earnings had amounted to such sum and our study of the evidence presented at the hearing on confirmation of sale has satisfied us that the referee is supported in his finding that the bidder's statements of accruals are greatly in excess of the actual amount. The evidence fully sustains the findings of the referee and the trial court that the proposed offer of George McBlair was insufficient; that it was impracticable to divide the property according to said proposed offer because of overlapping liens without serious loss; that it was not accompanied by sufficient deposit; and that the deposit made by McBlair with the restrictions placed thereon was insufficient and inadequate to insure performance of his offer to purchase. We are persuaded that no ground for upsetting the sale to Stern Bros. Investment Company was developed in the record by any proceedings had or offers of proof made after the order of confirmation was made by the referee on September 15, 1933.

■ It is urged through many assignments of error and in the briefs of appellants that the sale of the bankrupt's assets was not necessary or for the best interests of creditors and it is still urged upon us that the trustee ought to be permitted to continue to operate the business; and that we should take into consideration "the fact that by reason of the economic depression and financial stringency it was difficult, even well-nigh impossible, to obtain a higher cash bid." We do not find that the question was open at the time of the hearing before the referee in August and September of 1933. On December 22, 1932, the trustee had duly filed his petition for order of sale, specifying in detail the property and assets, in which he presented to the court under oath that the properties of the estate had been rapidly deteriorating in value and required the expenditure of large sums of money to properly develop, maintain, and improve them, and that the continuing operation of the properties by the trustee was rapidly becoming a real hazard to the interests of the creditors of the estate; the properties of the estate had received the widest advertisement for sale; that the trustee was reasonably familiar with all of the prospective buyers at the time; and that the creditors were all thoroughly familiar with the immediate necessity for a new sale; and that the creditors had already made exhaustive and extensive study of the particular properties of the estate and of their present value and that the trustee was of the opinion that the creditors of the estate would be benefited by a

sale of said property within a minimum of time·and by private sale for cash only. The order of the referee made on January 19, 1933, commanding private sale of the assets of the bankrupt, was made at a general meeting of the creditors when there were present the trustee and attorneys representing the general creditors, and many creditors in person, as well as many lien claimants appearing by respective attorneys and in person, and other parties in interest appearing by attorneys and in person. It was the fourth order to sell made by the referee and it does not appear that any direct attack was ever made upon the finding and order that the property should then be sold at private sale. There is no substantial testimony to show that the order was improvidently made, although it is now argued by appellants that the operations of the properties under court authority have resulted in very large net profits and betterment of the estate (a matter to be later discussed), and therefore that it is not necessary to sell the property. It must be conceded that at the time the sale was ordered the trustee's verified showing of the necessity to sell was fully acquiesced in by all the appellants and no exception was taken to the showing of the trustee "that said creditors are all thoroughly familiar with the immediate necessity for a new sale." Our study of the evidence which has been brought up also convinces that the order to sell was necessary and proper.

■ Other assignments of error are based on the claim that the trustee made the sale to Stern Bros. Investment Company under circumstances amounting to duress or that the sale was not his free and voluntary act. There was some testimony to show that at and for some months prior to the time when the trustee finally appended his signature to the contract he was laboring under extreme difficulties to deliver gas to the town of Liberty, Mo., his supply of gas having failed in severe cold weather, and that, while he was so laboring, a representative of the purchaser told him that if he sold the properties his troubles would be over, or words to that effect. But the trustee's testimony convinces that his negotiations for the sale to Stern Bros. were conducted by himself and his attorney, Mr. Bundschu, with the attorneys for Stern Bros. with orderly and businesslike deliberation. He testified:

"I negotiated with Mr. Page (attorney for Stern Brothers) several times and some two or three days prior to the final signing went over and discussed the terms and provisions of the proposed bid with (Mr. Thomson, attorney for Stern Brothers); it seems to me that we reached this kind of understanding, that we all met as near as we could on terms, leaving the amount open, as I recall it; each receded from his position on certain points and maintained his position on other points until a certain form of contract was obtained; after certain changes were suggested by me and (Mr. Thomson) I wanted a bid of $350,000. Mr. Page was prepared to bid $300,000 including the meter deposits and was not prepared to pay any more; I said I would try $340,000 as I recall, and then as I recall it we agreed that we couldn't make a deal, that I could go elsewhere and have the fullest good will from Stern Brothers and everybody."

Thereafter the parties again met, inserted the purchase price, and executed the contract according to the terms that had been previously agreed upon. The trustee further testified that he did not allege any fraud in procuring his signature to the contract. There was no testimony whatever of any coercion or duress practiced by the purchaser, Stern Bros. Investment Company. We conclude on consideration of all the testimony on this matter that the sale was entered into without duress and was the free and voluntary act of the trustee in the exercise of his best judgment.

■ Further assignments present the complaint that the contract of sale imposes conditions upon the trustee impossible of performance on his part and evidences an option rather than a contract of sale. This contention also appears to be without merit. The sale contract is short and no uncertainties or ambiguities are pointed out. It contains a recital that the properties contracted to be sold are being operated by the seller for the supplying of gas to its various patrons and include certain franchises granted by the cities and towns in which the seller is supplying and distributing gas and certain gas purchase contracts, a list being attached. The seller represented that all said franchises and gas purchase contracts were then in full force and effect and it was provided that if any of the said franchises or gas purchase contracts was, in fact, then ineffective, or in case a party thereto should challenge the validity, sufficiency, or present operative force thereof, the buyer might, at its option, at any time prior to the final closing date of the contract terminate the contract. This condition was not different in substance and effect from the customary reservation to the buyer

of a short time to satisfy himself of the validity of title offered him. At the time of the hearing on confirmation before the referee, the purchaser, through its attorney, declared itself satisfied as to the condition of the franchises and gas purchase contracts referred to, and waived anything further with respect to their acceptance. The sales contract also contains the provision that the contract was conditioned upon the ability of the buyer to procure the approval of the Public Service Commissions of the state of Missouri and of the state of Kansas of the purchase of said properties, and the continued operation thereof by the buyer or its designee and assignee as the buyer may prefer. The properties involved in the sale constitute public utilities in the states of Missouri and Kansas which, under the laws of those states, are subject as to sale and operation to jurisdiction of the Public Service Commissions. This provision of the contract of sale is a reasonable and proper one, having been included in practically all of the offers and proposals made to the trustee. Procuring the authority for such a purchase from the Public Service Commissions of these states is merely a preliminary though necessary step under the laws of these states to the acquisition of such properties. The evidence is that the Public Service Commission in Kansas has made the necessary record of approval to the nominee of Stern Bros. Investment Company and that the Public Service Commission of Missouri is merely waiting final confirmation of the sale before it takes action. The contract between the trustee and Stern Bros. Investment Company is not an option but a contract of sale and obliges the purchaser to receive and pay for the property conditioned now solely upon the approval by the state authorities referred to.

Under other assignments appellants contend that the Stern Bros. Investment Company bid was not the best bid. In this connection the several offers and the efforts which have been made by C. O. Moore to acquire the property are elaborately discussed. As stated in our former opinion, Mr. Moore was a successful bidder for the property under the second order of sale and deposited $100,000 with his bid. He defaulted on his contract and default was taken against him and the sale that had been made to him was set aside. Since then, both before and after the sale to Stern Bros., he has endeavored to have his original bid reinstated or to become the purchaser under new offers or bids. The record satisfies that each of his proposals and offers has been given careful hearing and consideration, but the evidence fully supports the final conclusion of the referee and of the trial court that Mr. Moore was not in financial position to buy the properties. There is no claim that he has money of his own to buy them with and he declined at a meeting of creditors before the referee to state upon what his expectations of getting the money in the future were based. He made disclosure to the referee, upon which disclosure the referee found without any contradiction in the record, that "it is very apparent from Mr. Moore's own statement that he does not now have any possible commitments of reasonably good prospects in the future out of which he will get his securities to carry out his contract within the time contemplated." There is no ground shown by the evidence to expect a better sale to Moore than has been made to Stern Bros. Investment Company.

At the hearing on confirmation before the referee, the trustee testified that with the exception of Moore and Butterworth, he had no other firm bids for the properties. Though we do not find any serious contention by appellants that the Butterworth bid was a better bid than that of Stern Bros., or that the properties should be sold to Butterworth, we have considered the bid and the circumstances surrounding it. It included a scheme for the organization of a corporation which would own and operate the properties and which would issue securities, and a condition of the bid was that the Public Service Commissions should approve the issuance of the securities. Furthermore, it was made after the trustee had closed the sale to Stern Bros. We think the referee rightly analyzed and compared the bid with others and properly rejected it.

The trustee produced at the hearing on confirmation a long list of those he deemed to be prospective purchasers of the properties and he was examined and testified as to the offers and bids that he had received. It is evident from the record that the trustee constantly endeavored to find purchasers for the properties, and he testified: "I have tried every day to get purchasers."

The record convinces that not only has no better bid than that of Stern Bros. been obtained before the hearing on the confirmation in August and September of 1933, but that in spite of the utmost efforts that were afterwards made, no better bid has been obtainable.

Appellants further argue that the sale to Stern Bros. Investment Company was

made at a price so grossly inadequate in view of the real value of the property that it should be set aside. It is contended that the operation of the properties under the supervision of the court has produced very large net profits; that "the property, during the financial emergency and economic depression weathered the storm with decisive economic strength"; and that its value has been greatly enhanced by additions and betterments. The record does not bear out the contentions. It does not contain any full or complete profit and loss accounting of the business carried on by the receivers and the trustee. The income tax return of the estate for the year ending December 31, 1932, immediately prior to the sale of the property to Stern Bros., disclosed no net income for taxation, but a loss of some $13,000. It is said that these figures were arrived at by deducting $34,365.71 for depletion and depreciation and that such deduction, although proper, should not be made in considering the point contended for. But there is convincing testimony of depletion of gas wells under the trustee's operation and of losses and burdens from inability to deliver gas and it is noted that in the income tax return some undetermined court costs and allowances were not included. It is stated in the brief of appellants that "total allowances, fees and costs in this case will approximate $150,000, additional referee and trustee fees, which is in the near neighborhood of the price to be paid for this estate by the alleged purchaser." We do not find these figures in the record nor any other final computation of such items, but do not doubt that the total of the amounts referred to will reach a large sum. In the argument that the properties were being profitably operated, isolated months of operation following the cut-off date of November 21, 1932, are pointed to as being very profitable, but the account is not fully made up and the uncertain costs and allowances are left out. We are constrained to note also the testimony of the trustee "that he could not pay all of the taxes that accrued since he had been trustee on all the properties from the cash that he had on hand and still continue to operate." He says, "Give me freedom of the properties with the right to liquidate certain property, I could pay, I don't mean today, all the taxes amounting to $18,-000, on all properties, which include the 1933 taxes." Without going into the minutia of the evidence, we are not persuaded that there can be found in any showing as to great net earnings of the properties under the direction of the court, any substantial proof that the sale to Stern Bros. was at a grossly inadequate price.

In the early stage of this bankruptcy, earnest endeavor was made to effect composition with creditors. The plan was to organize a corporation which would issue stocks, common and preferred, and bonds to be underwritten and sold to the public. The composition failed, but it illustrates the kind of financing to which it was thought the utility properties of the bankrupt adapted themselves. The possibilities of such financing attracted interest and attempts to buy from persons who did not have the money themselves, and a heavy responsibility was imposed upon the trustee and referee, shared by the trial court, to weigh the proposals, offers, and bids in selecting the best for acceptance. Despite the clash of interests in this long litigation, no charges of bad faith are made against the trustee or that he failed to do his honest best to get the best possible bid or in closing with the purchaser. On the question of the real value of the properties, therefore, and what they ought to sell for, we attach importance to the sworn showing and the testimony of the trustee. When he petitioned the court for an order of sale in December of 1932, he suggested that an upset price of $300,000 be set by the court, which shows he must have believed that such price, though doubtless less than he hoped to get, was not "grossly inadequate." He coupled with the suggestion the condition that the cut-off date should be November 21, 1933, and that the purchaser should assume payment of the meter deposits, exactly as specified in the sale to Stern Bros. Furthermore, the suggestion of the upset price brought the belief of the trustee directly home to the knowledge of all of the appellants herein, and they acquiesced in the further order of sale without protest. Also the sworn statement of the referee, on making the sale, that he had used reasonable diligence to sell the properties and that in his opinion the sale to Stern Bros. was the best cash offer that he was able to obtain, persuade that such was his belief at the time. A point is made of the fact that when the trustee was called as a witness at the hearing on confirmation before the referee in August and September of 1933, more than six months after he had made his sworn return, he refused to recommend confirmation of the sale. He did not deny that he had made every reasonable effort to sell the properties at the best possible price, nor that the Stern Bros.' bid was the best that he had been able to ob-

tain. We think his testimony reaffirms his sworn return as to those vital matters. But it was his thought that the responsibility for confirmation or refusal to confirm the sale rested upon the court and not on him, and his attitude was that if a better deal for the creditors could be had, he would be for it, he wanted to hear the evidence. His testimony also reflects that he then thought that if he could be continued in control and operation of the property, he could ultimately work out more for the creditors. On this basis, he would not recommend the confirmation of the sale. Such hopes, however, developed so long after sale, were not controlling upon the court.

██ Appraisals have been made of the properties reflecting a much greater value than that obtained on the sale. It is undoubtedly true, as stated by Judge Otis in his opinion of November 22, 1933, that "a large majority of the general creditors appear to believe that the amount bid by Stern Brothers is inadequate and that the properties are worth much more and can be sold for much more," but such beliefs, however honest, as well as the opinions of expert engineers and appraisers, avail nothing against the stern fact that a better bid was not to be had.

██ The trustee in bankruptcy has not joined in this appeal, but made a statement at the oral argument and filed a brief. He urges, among other things, that this court should take into consideration the question whether Mr. C. O. Moore has any claim upon the $100,000 which he deposited to secure the bid made by him in July of 1932. Consideration of the same question is also asked for by appellants and claimed by them to be material to our determination of the appeal. Mr. Moore is not a party to this appeal and the court declines to comment upon the matter. We find that the question whether Mr. Moore does or does not have such a claim is without bearing on the question whether the sale to Stern Bros. Investment Company should be confirmed.

██ The assignments of error herein cover some 38 pages of the brief and it has not been possible within the compass of an opinion to discuss them individually. They are not in compliance with the requirements of rule 11 of this court. Though it is undisputed that the findings and conclusions of the trial court fully sustain its judgment, errors are not assigned separately to the particular findings or conclusions, as required, but the assignments are laid in the form of arguments and

reasons addressed to this court. But we have considered upon all the grounds argued whether confirmation of sale should be upset, and are persuaded that it should not.

On the whole record, we are convinced that the parties have been accorded a full hearing as contemplated by law and by our former mandate; that the order commanding the sale was valid; that the sale was fairly made to the best obtainable bidder; that the contract was in proper form and evidenced a valid and binding sale subject to no unreasonable conditions; that there was no such gross inadequacy of price as would justify upsetting the sale; and that the sale was rightfully confirmed.

The order appealed from is affirmed.