### UNITED STATES v. PISANO et al.
### No. 10388.

United States Court of Appeals
Seventh Circuit.

Dec. 5, 1951.

See also, 7 Cir., 193 F.2d 361.

Maurice J. Walsh, Morris G. Kaufman, Chicago, Ill., for appellant.

Otto Kerner, Jr., U. S. Atty., Joseph E. Tobin, Asst. U. S. Atty., Chicago, Ill., for appellee.

Before MAJOR, Chief Judge, and FINNEGAN and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

Defendants appeal from judgments entered upon a verdict returned by a jury finding each of them guilty under counts 1 to 3 and 10 to 28 inclusive of an indictment charging them and one McNary and one Bowman with purchasing heroin, not in or from the original stamped packages, in violation of Section 2553(a), Title 26 U.S. C.; sale of heroin not in pursuance of a written order from the purchaser, in violation of Section 2554(a) of Title 26 U.S.C.; and receiving, concealing, buying and facilitating the transportation and concealment of heroin after importation into the United States, in violation of Section 174, Title 21 U.S.C. Count 28 charged all defendants with conspiracy to violate the Narcotic Act in violation of Section 371, Title 18 U.S.C. The relatively large number of counts is due to the fact that the indictment, as to each transaction, included three counts, one charging purchase, an-

other sale and the third, possession of narcotics. Only the counts mentioned reached the jury. Neither McNary nor Bowman was tried, as one of them had not been apprehended and the other had defaulted upon his bail bond and become a fugitive.

The evidence was, in substance as follows: Morris Taylor, an informer, on January 21, 1949, after having been searched by a narcotic agent and given some money with which to buy narcotics, met McNary and a man named Sonny, at 1228 South Peoria Street in Chicago. McNary walked with Taylor to the intersection of 12th and Peoria, where he made a telephone call; then they both returned to 1228 South Peoria, where, shortly, Ginnone appeared in an automobile. He entered the apartment where Taylor and McNary were and said to the latter "follow me." Ginnone, McNary and Sonny left together. A short time later, Sonny reentered and handed Taylor a package which he turned over to an agent of the Bureau of Narcotics and which was found to contain 107.4 grains of heroin hydrochloride.

On June 15 and 16, Taylor's attempts to contact Pisano met with failure. However, about 9 o'clock on the night of June 16, Bowman called at Taylor's home. Taylor went outside with Bowman and the two approached Pisano and Ginnone who were sitting in a parked cream-color car. Pisano asked Taylor what he wanted; Taylor replied that he wished to buy narcotics. Pisano said that he had turned his business over to Bowman, that if Taylor wanted anything, he should see Bowman and would be taken care of. Taylor inquired as to the price. Pisano answered that it "would then be right and the stuff would be right." Bowman told Taylor that if at any time he desired to buy narcotics, he should call him, Bowman, at a certain liquor store.

Following this, on June 22, after having been searched by Narcotic Agent Fields and found free of narcotics, Taylor was given money and driven to 47th and Prairie, Chicago, where he met Bowman at about 3 o'clock P.M. Bowman proceeded to make some telephone calls and advised Taylor that he could not contact his man but to return at 6:30. At the suggested hour, Tay-

lor returned to 47th and Prairie, where he again met Bowman. Taylor, Bowman and a third man, Koen, then drove to the west side of the city, in the vicinity of the County Hospital. There Bowman and Pisano met and conversed in front of a restaurant opposite the hospital. Pisano then talked to Ginnone, who was sitting in a station wagon. Bowman came back to the car in which Taylor and Koen were waiting. Taylor and Bowman then got out of their car and walked over to and talked to Pisano and Ginnone. Pisano told Taylor to get back in his car, saying "You are hot and I am hot. Why did you get out?" Taylor and Bowman then returned to the car driven by Koen and drove to 31st and Halsted Streets. There Koen and Taylor each handed Bowman $75. Bowman left the car, crossed the street to where Pisano was then standing on the northeast corner of the intersection, and conversed with him. Bowman then returned to the car and handed Koen and Taylor each a package, later found to contain heroin hydrochloride.

On June 27, 1949 Taylor met and conversed with Bowman at 47th and Prairie Avenue and then drove with him to the vicinity of the County Hospital, where Pisano and Ginnone were standing in front of the Y. M. C. A. Bowman got into the car driven by Ginnone. Shortly thereafter he returned to the car in which Taylor was sitting and gave the latter a package, which was later found to contain heroin hydrochloride.

On June 29, 1949, Taylor called Bowman, making an appointment to meet him at 6:30 at 47th and Prairie Avenue. Bowman again drove Taylor to the neighborhood of the County Hospital, where he left the car and met Ginnone, who was sitting in a light gray automobile near the Y. M. C. A. After a short conversation, Ginnone drove away, returning a short time later to the same location, where he handed Bowman a cellophane package similar to those Taylor had been receiving. Bowman then returned to the car in which Taylor was sitting and gave him the package, which was later found to contain heroin hydrochloride.

On July 5, 1949 about 6 o'clock, Taylor was driven to 47th and Prairie, where he again met Bowman. The two walked to 37th and South Parkway where Taylor gave Bowman money. They stood on opposite sides of the street for some 45 minutes, until Pisano and Ginnone appeared in a light gray automobile, which Bowman entered and which they then drove south to 37th Street, west of South Parkway. Some five minutes later Bowman returned to where Taylor was sitting and handed him a package which was found to contain heroin hydrochloride.

On July 13, 1949 Taylor met Bowman at 47th and Prairie Avenue at 6:30 P.M. The two men then walked to 44th and South Parkway where Taylor gave Bowman money; again each waited on opposite sides of the street. Shortly later Ginnone drove up in a light gray Chrysler. Bowman got in this car, which drove away. Some five minutes later Bowman returned and gave Taylor a package which was found to contain heroin.

None of these packages bore the required stamps and no order forms were surrendered by Taylor for any of them. Upon each occasion, just before he met any of the defendants, Taylor was searched by a Narcotic Agent, found free of narcotics, and given money.

One cellophane container which Taylor received was submitted to a fingerprint expert, who, upon comparison with Pisano's fingerprints, found a print on the container to be identical with that of the left index finger of Pisano.

The defendants did not testify and no evidence was offered in their behalf.

■ We have refrained from commenting upon the events of June 24, 1949 when Taylor, after having met Bowman at 47th and Prairie Avenue, was driven to the vicinity of Cook County Hospital. Bowman, after receiving $150, left the car and, returning a short time later, handed Taylor a package. Though Pisano and Ginnone were seen in the vicinity in the light gray automobile and at various places in and about where Taylor and Bowman appeared, there is no evidence that Bowman, at that time, made any contact with either Pisano or Ginnone. Accordingly we find the evi-

dence insufficient to support a verdict upon the counts relating to this incident, namely, the 13th, 14th and 15th.

Defendants assert error in the denial of the motions for acquittal, in the court's failure to submit the issue of entrapment to the jury, in admission of fingerprint evidence, in improperly instructing the jury, in the assumption that venue is within the statutory presumption and in overruling a motion for mistrial based upon a certain newspaper article read by some. of the jurors during the course of the trial.

The motions for acquittal raised the question of whether the evidence supported the verdict. For this reason we have related, in somewhat sketchy form, the evidence submitted by the government. Upon careful consideration of all the facts, it is clear to us that a jury question was presented as to each transaction mentioned and that the jury had before it amply sufficient evidence to support a finding that all the illegal drugs procured emanated from either Ginnone or Pisano or both. In each instance Bowman or McNary took Taylor's money, contacted one or both of the two defendants and immediately returned with the package of narcotics. There was no sign of narcotics and no transfer until either or both of these defendants had been contacted. Surely the verdict was entirely justified; in fact, the jury could not have reasonably found other than that Bowman and McNary received the narcotics from Ginnone and Pisano. Under well known rules no basis exists upon which we would be justified in deciding that the trial court erred in submitting the cause to the jury.

This is true not only of the counts charging substantive offenses but also of the one charging conspiracy to violate the narcotic laws. The various meetings, conversations, contacts and all other circumstances reflect abundant evidence upon which the jury could properly find that the participants had worked out a definite plan of procedure in illegal traffic in narcotics. Evidently Pisano and Ginnone were attempting to remain in the background as much as possible, but the telling fact is that no drugs appeared until Bowman and McNary, supplied with money, contacted them. The evidence amply satisfied the essentials for submission of the conspiracy count to the jury.

The fingerprint evidence constitutes one circumstance in evidence, which we think was properly submitted to the jury. There is no question but that the expert witness was qualified. There is no evidence that the fingerprints of Pisano were obtained otherwise than according to law. Though there is no showing that the envelope contained narcotics at the time the fingerprints were placed on it, from what we have said in this connection in a companion case, United States v. Pisano and Ginnone, 7 Cir., 193 F.2d 361, of even date, the evidence was properly received as one of the circumstances involved.

Defendants urge that the case must fall because of the government's failure to prove that heroin hydrochloride, the drug obtained, is a derivative of opium within the meaning of the statute. Defendants stipulated that the chemist would testify that he examined the contents of the various packages and that each of them contained heroin hydrochloride. No objection was raised at the trial that heroin hydrochloride is not a derivative of opium and the court instructed the jury that heroin is one of the drugs condemned by the statute.

We are not concerned with technical chemical designations. We know from common knowledge that heroin, even though it be found in a compound, is always a derivative of opium. As we said, in United States v. Holmes, 7 Cir., 187 F.2d 222, 225, "this court, as a matter of judicial knowledge, is justified in affirming the trial court's finding that heroin is a derivative of opium." Such was the conclusion also in Hughes v. U. S., 8 Cir., 253 F. 543, 545. After declaring that morphine, heroin and cocaine are derivatives of opium and that this fact has long been recognized the court took judicial notice thereof, saying that there was no obscurity, controversy or dispute as to the fact and that any one charged with a violation of the law, could gain complete knowledge of it by resort to dictionaries within reach of everybody. The court concluded, "Common knowledge, or the common means of knowledge, of the settled, undisputed, things of life, need

not always be laid aside on entering a court-room." See also Williams v. United States, 5 Cir., 294 F. 682, 683; Chadwick v. United States, 5 Cir., 117 F.2d 902, 903; Hughes v. United States, 8 Cir., 253 F. 543, 545; James v. United States, 5 Cir., 279 F. 111, 112; Greenberg v. United States, 8 Cir., 285 F. 865, 867.

■ As we understand defendants' contention, they insist that the government must offer direct proof of possession of the drug in order to raise the statutory presumption. We know of no reason why the evidence must be direct. It must be convincing, of course, but when it is clear that no narcotics were received by anybody until shortly after the defendants were present and had been dealt with, the question becomes one of fact for the jury. As we said, in United States v. Feinberg, 7 Cir., 123 F.2d 425 at page 426: "Whether the evidence was sufficient to establish guilt beyond a reasonable doubt, or whether it was equally consistent with innocence or guilt were matters for the jury. The jury believed the witnesses for the Government and brought in verdicts of guilty, thus establishing the fact that the defendants had fraudulently and knowingly facilitated the transportation of morphine and that the defendants had assisted in the buying and selling of heroin hydrochloride: * * *." See also Pitta v. United States, 9 Cir., 164 F.2d 601, 602 and cases there cited and Stoppelli v. United States, 9 Cir., 183 F. 2d 391, 394.

■ Defendants contend that proof of venue is not within the presumption created by Section 174 of Title 21 or Section 2553(a), Title 26 U.S.C. This question is definitely settled by recent decisions of the Supreme Court and the Courts of Appeals. Thus, in Casey v. United States, 276 U.S. 413, 48 S.Ct. 373, 72 L.Ed. 632, the Supreme Court said that such a statutory presumption is sufficient to sustain a conviction of the crime charged. Such proof necessarily includes venue. In Anderson v. U. S., 6 Cir., 189 F.2d 202, 205, after referring to the fact that some earlier decisions had held that the presumption did not include venue, the court concluded that these holdings had been reversed in Casey v. United States and that in that case "It was squarely held that the defendant must show he obtained the drugs in a mode permitted by law". In Frazier v. United States, 82 U.S.App.D.C. 332, 163 F.2d 817, 818, the court said: "Appellant contends there was no evidence that he purchased the drugs, or that he acquired them in the District. There was no direct testimony on either point but none was necessary. The statutory 'prima facie evidence' clause, quoted above, covers both the fact of purchase and the place of purchase. The statute here talks of prima facie evidence, but it means only that the burden shall be upon the party found in possession to explain and justify it when accused of the crime that the statute creates.' Casey v. United States, 276 U.S. 413, 418, 48 S.Ct. 373, 374, 72 L.Ed. 632."

■ It is zealously urged as error that a misleading article appeared in one of the Chicago newspapers concerning the trial after it had commenced and was read by some of the jurors. During the second day of the trial, the mishap was called to the attention of the Judge, who thereupon inquired of the jurors whether any of them had read the article. Some five of them said that they had. The court asked them whether anything they had read prejudiced them against the defendants. The spokesman for the jurors replied in the negative, saying that "there was not much to the article, it just mentioned the case." The Judge specifically inquired as to whether the fact that the jurors had read the article would prejudice them in any way against the defendants, so that the latter would not receive a fair trial. The response was in the negative, and the Judge then persistently inquired if they were sure, and the jurors replied in the affirmative. Thereupon the Judge advised them not to read any newspaper articles, to remain open-minded and to consider only the evidence presented in open court. He cautioned them that newspaper stories are not evidence; that the jurors should not read any publicity; that if they should see anything printed concerning the case, it must not be read until the trial was over, and that they must remain free and open-minded and give the defendants a free and impartial trial.

"This," he said to the jury, "is your duty. Can you do this?" The jury replied that they could. Not only did the court so advise and warn the jury when the matter was first called to its attention but it did so again in its final instructions. We regret that newspapers sometimes add to or distort court proceedings. It is impossible, we suppose, to expect zealous reporters to observe the proper nicety of discrimination as to what should be published concerning a trial or to keep their reports free of any connotation which may not truly reflect the actual evidence introduced. However, we find nothing here of such character as to destroy the purity of the trial. Moreover the trial judge took appropriate action and was satisfied to proceed; there is no evidence that his discretion was abused. This view, we think, is sustained by such authorities as Reining v. U. S., 5 Cir., 167 F. 2d 362; Bratcher v. U. S., 4 Cir., 149 F.2d 742, 746; Tinkoff v. U. S., 7 Cir., 86 F.2d 868.

Defendants assign error in the failure of the court to instruct the jury regarding entrapment. Of course, when there is evidence of entrapment, the issue must be recognized and adjudicated. But in the present case there is not the slightest bit of such evidence. None of the essential elements is presented. As we said, in U. S. v. Markham, 7 Cir., 191 F.2d 936, 937: "Ordinarily the defense of entrapment raises a question of fact which should be submitted to the jury under proper instructions. Sorrels v. U. S., 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413. But submission to the jury is not necessary when evidence of entrapment is entirely lacking."

Defendants insist that the court did not properly charge the jury as to the statutory presumption. The court advised the jury that the absence of appropriate tax-paid stamps from any of the drugs is prima facie evidence of a violation of the subsection by the person in whose possession they are found. The court charged the jury that prima facie evidence which, standing alone, is sufficient to convict and added: "If you believe from all the evidence and beyond a reasonable doubt that the defendants possessed the narcotics mentioned in these or any of these counts and that the said narcotics did not bear the required Internal Revenue Tax stamps, then you may find the defendants or either of them guilty as charged in those counts or any of them." The jurors were informed that prima facie evidence consists of evidence which, standing alone, is sufficient to convict but that, in order to be sufficient to sustain a conviction, such evidence must convince them of guilt beyond all reasonable doubt and, specifically, that the government must have shown, beyond reasonable doubt, that defendants had possession of narcotics illegally before they could be found guilty.

The judgments upon counts 13, 14 and 15 are reversed; those upon all other counts are affirmed.