**L. Walter HENSLEE, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

No. 16352.

United States Court of Appeals
Fifth Circuit.

June 29, 1957.

Theodore B. Stubbs, Russel H. Markwell, Galveston, Tex., for appellant.

Gordon J. Kroll, Asst. U. S. Atty., Malcolm R. Wilkey, U. S. Atty., Houston, Tex., for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal from the conviction and sentence of appellant, the former Executive Director of the Galveston Housing Authority, for violating the provisions of 18 U.S.C.A. § 1012.[1]

The gist of the offense charged and as to which there was ample evidence to sustain a jury's finding of guilty is that although the misappropriated funds did not come from sums actually advanced by the federal government, they were illegally taken from funds that were subject to regular reports to the Public Housing Administration and which were available for the benefit of the Public Housing Administration in certain respects, and that the failure to report these funds, consisting of rentals received from non-aided properties, constituted a false report to the Housing Administration and also amounted to the receipt by Henslee of compensation with the intent to defraud the Housing Administration, in violation of paragraph two of section 1012.

It was not disputed that appellant took personal control over substantial sums of money that did not belong to him and there is evidence that he spent some of this money for his own personal benefit, but he asserts that if this amounted to a crime it was a Texas crime and not an offense against the federal government. Because we find it necessary to reverse the judgment and remand the case for a new trial on a subsidiary ground, we need not consider the several specifications of error asserted by appellant, other than to say we think the trial court did not err in construing the law or in submitting the case to the jury on the record as made, except in its failure to grant the defendant's motion for mistrial on account of the prejudicial publicity that resulted from inappropriate action taken by the United States Attorney during the trial of the case.

This trial, conducted as it was in Galveston and involving a well known public figure in the person of the former Executive Director of the local Housing Authority, had continued through September 26th and September 27th. The testimony was practically completed on the afternoon of the second day and there remained the arguments to the jury and

---

1. "§ 1012. *Public Housing Administration transactions*

"Whoever, with intent to defraud, makes any false entry in any book of the Public Housing Administration or makes any false report or statement to or for such Administration; or

"Whoever receives any compensation, rebate, or reward, with intent to defraud such Administration or with intent unlawfully to defeat its purposes; or

\*　　\*　　\*　　\*　　\*

"Shall be fined not more than $1,000 or imprisoned not more than one year, or both." 18 U.S.C.A. § 1012.

the charge of the court for the morning of September 28th. In this posture of affairs the United States Attorney saw fit to file in the office of the Clerk of the District Court a paper denominated "Motion," but the true character and purpose of which are not readily apparent. This paper stated that in pending civil litigation between the Public Housing Administration and the Galveston Housing Authority the parties had agreed to a settlement and to a return of the properties theretofore taken over by the P.H.A. to the local Housing Authority. It recited that defaults and breaches that existed in the contract between the two Authorities had been cured and that it was proposed to return the properties to the local Housing Authority on October 1, 1956. It made reference to a "report from Charles E. Slusser * * * which report is attached hereto and made a part hereof."

This report, which, as indicated, was filed with the "motion," summarized major breaches including:

"1. * * *

"2. The acquisition and improvement of off-site properties with funds withdrawn from the Development Fund of the Federally-aided projects, which off-site properties were not used for the alleged purpose of relocating residents from the sites of the new projects.

"3. The interest of your former Executive Director, L. Walter Henslee, in these properties which constituted violations of the Annual Contributions Contract and the Texas Statutes.

"4. The conversion of rentals from these properties by Henslee to his personal use.

"5. The acquisition of motor vehicles allegedly needed in your housing program which were diverted to the use and financial benefit of Henslee.

"6. The payment of unauthorized salary increases to Henslee.

"7. The purchase of substantial amounts of material without soliciting bids and from organizations in which Henslee had an interest.

"8. The diversion of material and labor for work not performed in connection with the Federally-aided projects but for the benefit of Henslee or his friends.

"9. The receipt of Henslee of "kick-backs" from an Authority contractor."

Slusser's report further asserted "we established (and) verified" that approximately $66,000 of Authority funds were embezzled, misappropriated, diverted or improperly accounted for by Henslee, and that there had been a diversion of over $70,000 from the Revolving Fund for use in the promotion of enterprises of the Pelican Island Development Corporation (in which Henslee was interested). It also stated: "It is our understanding that your Authority intends to proceed against Henslee's surety and such other persons as may be indebted to you because of these maleficent transactions."

As above stated, no reason appears as to why or for what purpose this "motion" was filed in connection with the civil action, much less why it was filed on the particular day of the trial of the criminal action against Henslee. Appellant charged that the paper had been filed knowingly and wilfully by the Assistant United States Attorney in charge of the prosecution with the intent and purpose that it would be given publicity and thus influence the jury in the consideration of the criminal case. The Government attorney, in a hearing on the motion for mistrial, stoutly denied this allegation. There is no support for the contention other than the fact of its filing and the fact that it was widely publicized both by newspaper and radio the evening of September 27th and the morning of September 28th. The trial court apparently rejected any theory of intentional misconduct by the official concerned, and we of course accept the trial

court's resolution of this issue. In point of fact, however, there was immediate and widespread publicity, both radios and newspapers commenting particularly on the fact that "Charles E. Slusser's letter embracing these charges (that $66,000 in public funds was embezzled during Henslee's tenure and that another $70,000 was improperly expended on a project in which he had an interest) was made public in one federal court proceeding while in another the Justice Department sought to convict Henslee of making false reports to the Public Housing Administration with intent to defraud."

After considering and denying the motion for mistrial, the trial judge made a statement to the jury that it had been testified by one or more witnesses that there were in the press and radio certain news stories which had reference to "some of the matters with which we are concerned here in this trial, that is, with Mr. Henslee and his handling of certain funds, rentals, etc. connected with the off-site properties." He then asked the jury as follows:

"I want to ask whether any member of the jury—inadvertently I am sure in view of my instructions at the beginning—may have read or heard those news reports connected with that matter. Did anyone do so?"

There was no response offered by any member of the jury to this question.

The Government contends that since no member of the jury offered the information that he had violated the court's instruction as to the reading of newspaper articles concerning the trial, this clearly establishes that the publicity thus improperly injected into the case could not have prejudiced any member of the jury.

█ Within reasonable limits of course every accused must run the risk that some of the jurors may violate their duty and consciously or unconsciously subject themselves to such influences as radio, newspaper or television comments on the case in which they are sitting. However, even in cases where such publicity seems to arise naturally and without reference to any effort or action on behalf of the parties, the courts have granted a new trial if they felt that such publicity may have prejudicially affected the verdict. Juelich v. United States, 5 Cir., 214 F.2d 950; Shepherd v. Florida, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740.

█ Where, as here, unwanted publicity resulted from action taken by the Assistant United States Attorney in connection with something entirely apart from the proper conduct of the trial, however innocent he may have been of any wilful purpose to influence the jury, a much higher standard prevails. As said by the Supreme Court in Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 633, 74 L.Ed. 1314:

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer."

Without in any way imputing an improper motive to the prosecuting officer here, we do find that in the proper conduct of the affairs of his office it should have been apparent that for him to file this motion with the inclusion of the self-serving and irrelevant statements of offenses and crimes not comprehended in the indictment for which Henslee was on trial might well produce the highly unfortunate publicity that actually resulted. His failure to apprehend the natural result of his act is as damaging to the cause of justice as if he had failed in his duty to act with a scrupulous regard for fairness.

We think that justice requires that the judgment be reversed and the case remanded for a new trial. It is so ordered.