**Howard R. MARSHALL, Appellant,**
v.
**UNITED STATES of America,**
**Appellee.**
**No. 5796.**

United States Court of Appeals
Tenth Circuit.
July 22, 1958.

Rehearing Denied Aug. 21, 1958.

Certiorari Granted Nov. 17, 1958.
See 79 S.Ct. 153.

George J. Francis, Denver, Colo., for appellant.

Arthur A. Dickerman, Los Angeles, Cal. (Donald E. Kelley, U. S. Atty. for District of Colorado, Robert S. Wham and James C. Perrill, Asst. U. S. Attys., for District of Colorado, Denver, Colo., and Leonard D. Hardy, Atty. U. S. Department of Health, Education and Welfare, Washington, D. C., on the brief), for appellee.

Before MURRAH, PICKETT and LEWIS, Circuit Judges.

LEWIS, Circuit Judge.

Appellant was convicted on two counts of an information charging violation of

the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 et seq. The principal issues before us spring from appellant's contentions that as a matter of law the defense of entrapment was established and that he was prejudiced beyond recall by newspaper accounts published during the course of his trial. Other errors assigned question the jurisdiction of the court and the sufficiency of the evidence to support the verdicts.

The alleged entrapment centers around the activities of Robert E. Keating, an inspector for the United States Food and Drug Administration and an uncontroverted witness for the prosecution. Keating first met appellant in Denver, Colorado on April 18, 1956. The introduction of the two men was made at appellant's apartment by mutual friends, was purely social in form and did not disclose Keating's official employment. The conversation at this initial meeting was casual and general. On April 23 Keating returned to appellant's apartment and again visited with appellant and his wife. After some further social talk, Keating stated that he was driving to Dallas, Texas, that evening and requested from appellant some stay-awake pills to help him in the traveling. Appellant replied that Keating should obtain and take some No-Doz[1] tablets and drink coffee. Keating replied that he had tried No-Doz and coffee without obtaining the desired effect and wanted something different. Appellant repeat-ed his recommendation and the conversation was then diverted into other subjects. After Keating left the apartment he was hailed by appellant and handed a package containing five tablets and two capsules. Appellant stated that the tablets were to be used if Keating became sleepy while driving and that the capsules should be taken if he was nervous after arriving in Dallas. Chemical analysis of the tablets established them to be dextro-amphetamine sulfate, a drug within the meaning of 21 U.S.C.A. § 353(b) (1) (B)[2] and within the prohibition of unlicensed dispensing under 21 U.S.C.A. § 331(k).[3]

On May 1, Keating again called on appellant, stating that he had "gotten along very well" on the Dallas trip and would like a hundred or so of each of the drugs for a trip to be made to Los Angeles upon the following day. Appellant replied that he would have to go to the drugstore, refused Keating's suggestion that they go together, and told Keating to return later. This he did and was handed two vials containing 50 tablets and 24 capsules later analyzed as the prohibited drug. Keating paid appellant $15 upon this occasion.

It is undisputed that all of Keating's representations relative to his identity, occupation, trips and use of drugs were entirely false and that upon each occasion the atmosphere of social friendship was created by conversation unrelated to the subject of stay-awake tablets.

---

1. No-Doz is a patented product sold freely over the counter.

2. 21 U.S.C.A. § 353 (b) (1). "A drug intended for use by man which—

   *    *    *    *    *    *

   "(B) because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug  *  *  *

   "(C)  *  *  *  shall be dispensed only (i) upon a written prescription of a practitioner licensed by law to administer such drug.  *  *  *  The act of dispensing a drug contrary to the pro-visions of this paragraph shall be deemed an act which results in the drug being misbranded while held for sale."

3. 21 U.S.C.A. § 331. "The following acts and the causing thereof are hereby prohibited:

   *    *    *    *    *    *    *

   "(k) The alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded."

The defendant offered no evidence. The issue of entrapment was submitted to the jury upon instructions not here questioned and the defense was rejected by conviction. Appellant urges that the court should have ruled as a matter of law that entrapment was established.

The fountainhead rule and philosophy of entrapment was set out in Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, and very recently debated in Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848, and Masciale v. United States, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859, both decided May 19, 1958. In Sherman, the court in reviewing the undisputed testimony of a government witness unanimously concluded that the trial court was required under the circumstances therein to direct a verdict effectuating the defense of entrapment as a matter of law. The order of reversal set aside a verdict of a jury which had considered and rejected entrapment as a defense submitted to its consideration under instruction of the court. Since the instant case, as Sherman, involves only consideration of the undisputed testimony of a government witness with no issue of credibility involved we conclude that submission of the issue of entrapment to the jury was improper. However, such submission could not prejudice appellant, in fact could but give him an unwarranted advantage, unless a directed verdict was required as a matter of law. A comparison of the activities of Keating with those of the informer in Sherman, where entrapment was established as a matter of law, and with those of the government agent in Masciale, where the court held entrapment not so established, shows the latter case to be persuasive.

In Sherman, the government informer met the defendant at a doctor's office where both were apparently being treated for narcotics addiction. They discussed over a period of time their difficulties in overcoming their habits and finally the informer confessed that he was unable to do so, begging the defendant to help him find a source of supply. Only after a number of repetitions of the request did the defendant finally procure the drug for his acquaintance. The result of this conduct was that the defendant himself returned to the use of narcotics. Emphasis is placed upon the fact that the government played upon the known weaknesses of the defendant and that the crime resulted from the "creative activity" of the law enforcement officials. See 287 U.S. at pages 441, 451, 53 S.Ct. at pages 212, 216.

In Masciale, the defendant was introduced to a government agent by an informer who did not reveal the agent's capacity with the government. The agent solicited the defendant for an introduction to a supplier of heroin. The court noted that the factual situation was such as to allow an inference that the defendant needed no persuasion to commit the crime.

Although in our case the activities of Keating consisted of artifice and deceit to lay a trap for defendant we believe the activities of the government to be well within allowable limits. The law will protect the innocent from being led to crime through the activities of law enforcement officers, Sherman v. United States, supra, but it will not protect the guilty from the consequences of subjectively mistaking apparent for actual opportunity to safely commit crime. Sorrells v. United States, supra; Archambault v. United States, 10 Cir., 224 F.2d 925.

During the course of the trial two articles of a reckless nature were published in local newspapers covering matters far removed in time and place from a factual report of the trial occurrence. Six of the jurors read one of the articles and two of the six had read both. The trial court separately interviewed, in the presence and with the assistance of counsel, each of the jurors and thereafter denied a motion for mistrial. Each

of the jurors indicated the articles would in no way influence his verdict.[4]

■■ It is conceded that a motion for a mistrial is addressed to the sound discretion of the trial judge, and whether it should be granted depends upon all of the circumstances in the case, United States v. Carruthers, 7 Cir., 152 F.2d 512; Marson v. United States, 6 Cir., 203 F.2d 904; Webb v. United States, 10 Cir., 191 F.2d 512. The mere appearance of articles concerning the trial cannot compel a new trial, for the defense may at times be aided rather than hindered or the report may only convey to jurors that which they had heard the previous day in court or amount to fair comment thereon. Miller v. Commonwealth of Kentucky, 6 Cir., 40 F.2d 820; Klose v. United States, 8 Cir., 49 F.2d 177; United States v. Pisano, 7 Cir., 193 F.2d 355. A cautionary instruction against prejudice or consideration of evidence beyond that presented in the courtroom has been held in such instances to be sufficient safeguard for defendant's rights.

■ It is true that in certain instances the probable influence of newspaper publicity is so obvious that instructions by the court cannot be held to have preserved inviolate defendant's rights to a fair trial before an unbiased jury. See concurring opinion of Justices Jackson and Frankfurter, Shepherd v. State of Florida, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740; Griffin v. United States, 3 Cir., 295 F. 437. But the difficulties of ever obtaining a jury completely unknowing and hence presumably unprejudiced in this day of wide coverage and circulation of newspapers presents a very real problem in the administration of justice. For this reason, some courts have been led to holding that to secure a reversal on this ground the defendant must demonstrate that the failure to declare a mistrial under such circumstances was prejudicial to him, Gicinto v. United States, 8 Cir., 212 F.2d 8, certiorari denied 348 U.S. 884, 75 S. Ct. 125, 99 L.Ed. 695; United States v. Carruthers, supra.

Had the instant trial been to the court alone it would be unquestioned that the

4. Typical of the responses received by the court is that of the juror Bottinelli.

"The Court: Morning, Mrs. Bottinelli, sit down right there. What I am inquiring about, Mrs. Bottinelli, are a couple of newspaper articles about this case, one of them appeared in the Post last night and one of them in the News this morning. Did you read either one of these pieces?

"Mrs. Bottinelli: Yes, I did, I read the one in the News.

"The Court: The one in the News this morning?

"Mrs. Bottinelli: Yes.

"The Court: Did anything you read in that item prejudice you in any way against the defendant?

"Mrs. Bottinelli: No, I would try to be as fair as I could.

"The Court: Would what you read influence you in any way in reaching a verdict on the case?

"Mrs. Bottinelli: No.

"The Court: You could lay that out of your mind entirely and decide the case on the evidence you hear from the witness stand?

"Mrs. Bottinelli: The evidence I've got to understand is whether he sold the medicine, so that would have nothing to do from this.

"The Court: You would decide that from the evidence in the courtroom?

"Mrs. Bottinelli: Yes, and not the rest.

"The Court: You wouldn't have in mind this article you read in the newspaper whether he is guilty or innocent, is that right?

"Mrs. Bottinelli: That's right.

"The Court: Do any of you want to ask any further questions? All right, Mr. Francis.

"Mr. Francis: I realize you want to be as fair as possible and certainly we would not have this jury if we didn't think every member was fair. Do you feel in your heart and without restraint that if you were in the defendant's position, that is to say, sitting where Mr. Marshall is sitting, and your own mind is as it is now as a result of having read the paper, that you could still feel that you could absolutely, impartially listen to the case and bring in a verdict?

"Mrs. Bottinelli: Yes, I think I could.

"Mr. Francis: Fine, thank you very much.

"The Court: Thank you very much."

court would be capable of and would divorce the extraneous matters from his mind and be perfectly free to continue with the trial. The care with which the trial court explored the knowledge and feeling of the individual jurors indicated to him that each juror was similarly qualified to proceed without prejudice. We cannot say the trial court abused its discretion in accepting as true the solemn statements of the individual jurors that no improper influence would carry over into their deliberations. See United States v. Postma, 2 Cir., 242 F.2d 488. Strengthening our view that the trial court did not err in denying a mistrial is the completed record of the trial for, as stated in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557:

> "In the final analysis judgment in each case must be influenced by conviction resulting from examination of the proceedings in their entirety, tempered but not governed in any rigid sense of stare decisis by what has been done in similar situations. * * * Necessarily the character of the proceeding, what is at stake upon its outcome, and the relation of the error asserted to casting the balance for decision on the case as a whole, are material factors in judgment." 328 U.S. at page 762, 66 S.Ct. at page 1246.

Here no affirmative defense was offered, neither the appellant nor a witness for him testified in his behalf; he was content to rely upon the hope of a failure of proof by the prosecution. The evidence was uncontroverted that he committed the crime and his contention that he was entitled to go to the jury on evidence of entrapment appearing in government testimony was, as we have held, without merit. Under all of the circumstances of the case, therefore, a jury properly instructed and acting in accordance with its duty could but return a verdict of guilty. We find no area for prejudice to occupy, even if it existed.

Appellant's other contentions require little discussion. Asserting in the alternative that the federal court had no jurisdiction to try this offense because the drug, although shown to have traveled in interstate commerce, was no longer within federally protected traffic or that Congress constitutionally lacked the power to grant such jurisdiction, appellant cites the controlling case of United States v. Sullivan, 332 U.S. 689, 68 S.Ct. 331, 92 L.Ed. 297. Both propositions were settled in that case contrary to appellant's position on facts sufficiently similar to preclude argument.

21 U.S.C.A. § 331(k) makes it an offense to do any act with respect to a drug which results in its being misbranded while the article is held for sale *after shipment in interstate commerce.* The Supreme Court in the Sullivan case refused to give a restrictive interpretation to the statute because Congress intended to give protection to the ultimate consumer from the moment of the introduction of a drug into interstate commerce to the time of final delivery, regardless of intermediate intrastate transactions. It was there held that the Act as thus construed does not exceed the constitutional power of Congress under the Commerce Clause or invade the powers reserved to the states.

The prosecution's case showed that the dextro-amphetamine sulfate tablets were manufactured in New York and that they were ultimately dispensed by appellant in Colorado. Apparently in this, as in most cases, it was impossible to trace the route taken in interstate commerce or to show that appellant received them from an interstate sale, but under the language of the statute and the interpretation of the Supreme Court, intervening sales are immaterial. Archambault v. United States, supra.

Appellant finally argues that the proof that the drugs were manufactured in New York was incomplete, basing his argument on the fact that the tablets were compared for identification purposes with similar tablets previously collected from various manufacturers by

the laboratory of the Food and Drug Administration. However, this comparison with the "reference collection" was only preliminary and the investigation was concluded at the plant of the New York pharmacal company where identification both chemical and physical was made by the testifying witness. There is no merit in appellant's contention that the fact of interstate shipment was not adequately proved.

Affirmed.

MURRAH, Circuit Judge (dissenting).

We all appreciate the necessity for maintaining the inviolability of jury trials and our inescapable duty to vouchsafe them in the administration of justice. And, we know that we can do so only by wholly disinterested jurors whose judgments are based only upon a consideration of competent proof produced in open court. See Southern Pacific Co. v. Klinge, 10 Cir., 65 F.2d 85; Little v. United States, 10 Cir., 73 F.2d 861; Stone v. United States, 6 Cir., 113 F.2d 70; Briggs v. United States, 6 Cir., 221 F.2d 636. We recently had occasion to re-emphasize our solicitude in this regard. Consolidated Gas & Equipment Co. v. Carver, 10 Cir., 257 F.2d 111. And see also Rubenstein v. United States, 10 Cir., 227 F.2d 638, certiorari denied 350 U.S. 993, 76 S.Ct. 542, 100 L.Ed. 858. Our problem is to achieve this ideal in an environment where crime and violence are exploited by news media and jurors are likely to be exposed, and consciously or unconsciously influenced by the emotional impact of the exploitation. In earlier times juries were completely insulated from all outside contacts. In modern times, the rules have been relaxed to allow jurors to separate under appropriate admonition not to read news accounts of the case on trial or to discuss the case with anyone, or to allow anyone to discuss it with them. Jurors have been trusted to observe these admonitions, and our faith has, in the main, been vindicated. We have indulged in the assumption that mere opportunity for prejudice or even corruption is no proof of it. See Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021.

The necessity for conducting trials in an environment where separated jurors are almost unavoidably exposed to news comment, has led some courts to accept the "standard judicial hypothesis that cautioning instructions are effective" to eradicate the contaminating effect of inflammatory exposures, unless there is a "clear and present danger" of the deprivation of a constitutionally protected fair trial. See Chief Judge Clark in United States v. Leviton, 2 Cir., 193 F.2d 848, 857. See also Reining v. United States, 5 Cir., 167 F.2d 362; United States v. Allied Stevedoring Corp., 2 Cir., 241 F.2d 925; United States v. Postma, 2 Cir., 242 F.2d 488; Henslee v. United States, 5 Cir., 246 F.2d 190. Many cases on the subject are collected in an Annotation, 31 A.L.R.2d 417.

I agree with Judge Frank (dissenting in the Leviton case, 193 F.2d at page 865) that "trial by newspaper", even in the very midst of irresponsible news comment, is neither inevitable nor tolerable. Without assaying to curb extraneous comment on trials, it is my belief that jurors, while engaged in the trial of a case, can be appropriately and conveniently insulated from exposure to public emotionalism, which often attends criminal cases. Emphatic admonitions by the trial court at the very outset of the trial against the reading of newspapers or listening to news media, would go a long way toward safeguarding the trial against insidious and inflammatory matters. The trial court is, to be sure, the first and best judge of what is calculated to contaminate the jury or may have the ineradicable effect of doing so. Appellate courts should interfere only when matters of judicial policy are involved. In my opinion, matters of policy affecting the administration of criminal justice are involved here and it is my duty to speak.

Of course intrusions may be only trivial or innocuous and certainly cur-

able by appropriate admonitions. It is important that mistrials or new trials not be granted for "trifling reasons". See Southern Pacific Co. v. Klinge, supra. They may not be calculated to or have the effect of unduly influencing a juror, either consciously or unconsciously. But the newspaper article to which some of the jurors in this case were exposed stated not only the developments in the courtroom, it went on to state categorically that the accused had a "record of two previous felony convictions"; that while serving a forgery sentence in a state penitentiary, he had testified before a state legislative committee then studying new state drug laws; that he had told the committee of having practiced medicine with a twenty-five dollar diploma received through the mails; and had written and passed prescriptions for dangerous drugs. The other newspaper article to which some of the jurors were exposed related that the accused had been arrested with his wife; that she had been convicted on drug charges in the same court and sentenced to jail.

Since the accused elected to stand mute and did not offer his character as a defense, these statements were inadmissible and manifestly prejudicial. See Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168. Indeed, no attempt was made to inject these matters into the trial of the case, and the court would have doubtless dealt firmly with any attempt to do so. Recognizing the gravity of the matter, the court conducted a searching inquiry concerning the jurors' exposure to the newspaper articles and elicited from each of the jurors who had read them a vow that he or she was uninfluenced thereby, and would try the case as if they had not read them. The inquiry was as careful and the responses as positive as one could expect, and if we are to take the jurors' conscientious word for their state of mind, we must assume that all extraneous knowledge of the accused's prior and damaging record was completely banished from the jurors' minds and did not influence their consideration of his only defense of entrapment. But, the "naive assumption that prejudicial effects can be overcome by instructions to the jury * * * all practicing lawyers know to be unmitigated fiction." See Jackson concurring in Krulewitch v. United States, 336 U.S. 440, 453, 69 S. Ct. 716, 723, 93 L.Ed. 790.

Without questioning the thoroughness of the judicial inquiry, or impugning the conscientiousness of the jurors' avowals, it is my firm conviction that no juror could try this accused on the issue of whether he was in fact induced by the government to commit the act for which he was on trial as if they did not know that his past record and moral traits inclined him toward it. I cannot believe that the untrained human mind is capable of any such nice discriminations. It is too much to expect a juror, sensing the impropriety of having read an extraneous and prejudicial account of a case he is then trying, to admit any prejudicial effect.

If the jury is yet to be the factual judge of the defense of entrapment and the predisposition of the accused rather than the conduct of the government is to be the legal test, i. e. see Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848; and Masciale v. United States, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859, prior record and moral traits become of primary importance in the determination of that vital issue. For in cases like this where entrapment is the only defense, prior convictions of the same offense are to be sure the best evidence to show essential predisposition. This brings us face to face with Mr. Justice Frankfurter's warning of the "Danger of prejudice in such a situation". For, said he, "The defendant must either forego the claim of entrapment or run the substantial risk that, in spite of instructions, the jury will allow a criminal record or bad reputation to weigh in its determination of guilt of the specific offense of which he stands charged." Concurring, Sherman v. United States, supra, 356 U.S. at page 382, 78 S.Ct. at

page 826. The only escape from the dilemma is to commit the issue of entrapment to the court. But, so long as it remains a jury question, record and reputation to prove predisposition or lack of it must be relevant, competent and admissible. Harbold v. United States, 10 Cir., 255 F.2d 202. If so, such evidence ought certainly to be produced in open court with the traditional right of confrontation and cross examination. If they are to be excluded, as in this case, they ought not be permitted to seep into the jury room to poison the minds of the jurors on the vital issue which divides guilt and innocence. In sum, it is my view that if the extraneous matter disclosed in the newspaper articles is forbidden, it is ineradicably prejudicial. If it is competent and admissible, it ought to be imparted to the jury in open court. In any event, I would reverse for a new trial.