**UNITED STATES of America ex rel. Jerome ROSENBERG, Petitioner-Appellant,**

v.

**Vincent R. MANCUSI, as Warden of Attica State Prison, Attica, N. Y., Respondent-Appellee.**

**Nos. 637, 692, Dockets 32522–32551.**

United States Court of Appeals, Second Circuit.

Argued March 24, 1971.

Decided June 24, 1971.

---

Hays, Circuit Judge, dissented and filed an opinion.

Robert Kasanoff, New York City, Robert D. Kamenshine, Nashville, Tenn., the New York Legal Aid Society, for petitioner-appellant.

Brenda Soloff, Asst. Atty. Gen., Samuel A. Hirshowitz, First Asst. Atty. Gen., Louis J. Lefkowitz, Atty. Gen., for respondent-appellee.

Before WATERMAN, KAUFMAN and HAYS, Circuit Judges.

WATERMAN, Circuit Judge:

Petitioner-appellant Rosenberg and two codefendants, Anthony Portelli and Anthony Dellernia, were tried before a jury in the New York Supreme Court, Kings County, on two counts of murder in the first degree for the killing, on May 18, 1962, of two policemen who interrupted the robbery of a tobacco store in Brooklyn. Rosenberg and Portelli were convicted and sentenced to death. The sentences were subsequently commuted to life imprisonment, the convictions were affirmed on appeal,[1] and certiorari was denied by the U. S. Supreme Court.[2] Dellernia was granted a mistrial and was subsequently acquitted after a second trial.

Rosenberg, confined in the New York State prison in Attica, New York, filed two applications for habeas corpus in the Western District of New York. One of these raised the issue of adverse pretrial publicity, and this application was transferred to the Eastern District of New York, the district that includes Kings County, where it was denied after

1. People v. Portelli and Rosenberg, 15 N.Y.2d 235, 257 N.Y.S.2d 931, 205 N.E. 2d 857 (1965), remittitur amended 16 N.Y.2d 537, 260 N.Y.S.2d 649, 208 N.E. 2d 458 (1965).

2. 382 U.S. 1009, 86 S.Ct. 612, 15 L.Ed.2d 524 (1966).

an examination of the record. The other application raised Sixth Amendment issues concerning the right of the accused to confront adverse witnesses and due process issues concerning the coercion of a witness's testimony. This application was also denied. The appeals from the denials were consolidated and the Legal Aid Society was appointed as counsel. Because of the complexity of the issues, we set forth a detailed narration of the background of the case, beginning with the details of the robbery as elicited from the prosecution witnesses at trial.

Louis Ferrara, who was employed in Dellernia's brother's candy store, testified that on May 18, 1962, he overheard a conversation between Rosenberg and Anthony Dellernia in which Rosenberg said something about a "score," meaning a robbery, and Dellernia objected to the choice of the neighborhood. Later in the morning, while on an errand, Ferrara witnessed the receipt of a gun by Dellernia from one Zarcone. On returning from this errand, Ferrara saw Rosenberg and Portelli engaged in conversation outside the candy store. Still later Ferrara loaned Rosenberg a pair of sunglasses with his nickname "Gee" scratched on the ear pieces. Finally, at about 3:30 P.M., Ferrara heard Dellernia ask his brother for the keys to his car "[b]ecause he had to go to pick up Jerry Rosenberg." Dellernia took the keys and departed with one Linda Manzione.

Miss Manzione, a former girl friend of Rosenberg, knew all three defendants. She testified that at 2 P.M. on the day of the shooting she had seen Rosenberg taking a gun from a shelf in Dellernia's brother's store. This gun was similar to one she had previously seen in Rosenberg's possession and to the one later found near the scene of the robbery. Later, around 3:30 P.M., she left the candy store with Dellernia, and they picked up Rosenberg and Portelli. After a brief conversation evidencing some suspect plan, Rosenberg and Portelli were dropped off.

Shortly after 3:30 P.M. the Borough Park Tobacco Company, owned by David and Robert Goldberg and their father, was robbed by two men, one of whom apparently remained near the front of the store while the other herded the customers and the Goldbergs into a storeroom. This latter robber (whom we will refer to as the "inside" robber) wore sunglasses and held a handkerchief over his face with one hand; there was a gun in the other hand. His apparel matched the description of the clothing worn by Rosenberg when Miss Manzione had last seen him a few minutes earlier. As this robber attempted to close the door to the backroom, he momentarily lowered the handkerchief from his face, revealing himself to Robert Goldberg, who later identified the face, so disclosed, to be that of Rosenberg.

Apparently disturbed about the dearth of money in the cash register, this "inside" robber went back to the storeroom and demanded that someone show him where the money was. David Goldberg took the robber to the front of the store and gave him what additional money there was in the office. The robber, still unsatisfied, flew into a rage and went back to the storeroom where he demanded more money from Robert Goldberg. Between the front office and the storeroom, the robber had substituted a towel stained with ink for the handkerchief he had been using as a face mask. Just after the robber demanded more money from Robert Goldberg, there was a volley of shots. David Goldberg, who was still in the front office, turned toward the entrance and saw Luke Fallon, whom he knew to be a police detective, fall to the floor with his gun in his hand. In the same volley, Detective John Finnegan, who was outside the store entrance, was also shot.

Robert Goldberg rushed out of the storeroom at this point and saw the "inside" robber running around in a frenzy. Goldberg continued toward the front of the store and, in so doing, encountered a man whom he later identified as Portelli. Goldberg asked if the man was a

cop. The man paused, said he was a cop, and ran toward the street door. Before he reached the door he encountered David Goldberg. He again yelled that he was a cop and rushed out the door. After Portelli ran out, David Goldberg looked toward the back of the store and saw the "inside" robber still running around in a frenzy with the ink-stained towel outstretched from his face. He identified this robber as Rosenberg. Rosenberg still had his gun in one hand and the towel in the other when he finally fled from the store.

The shots had attracted much attention, and as the robbers exited from the tobacco store there were several witnesses who corroborated the descriptions given by the Goldbergs. In addition, Mrs. Brenda Izzo, who lived on the route taken by the "inside" robber, witnessed a man, obviously in very hasty flight, run up the steps of her apartment house. Encountering Mrs. Izzo, he paused, looked back behind him, and continued into the apartment house past Mrs. Izzo. During the pause Mrs. Izzo caught a very good look at the man and later identified him as Rosenberg. At the time he was not wearing a hat or sunglasses, and he had nothing in his hands; his clothing matched the description given by the other witnesses and by Miss Manzione.

Later, in a trashcan on the route from the tobacco store to Mrs. Izzo's apartment building, police discovered Ferrara's sunglasses, the ink-stained towel taken from the tobacco store, and a hat which Rosenberg had bought a week earlier and which matched the description of the hat worn by the "inside" robber.

While the robbery was being executed, Dellernia and Miss Manzione were parked in the near vicinity. Miss Manzione testified that when gunshots were heard, Dellernia pulled away quickly from the curb and said, "He never learns, he never learns." When Miss Manzione asked, "Who?," Dellernia responded "Jerry," meaning Rosenberg. Dellernia returned to the vicinity of the tobacco store, and asked Miss Manzione if she saw Rosenberg anywhere. She did not.

As would be expected, this double "cop-killing" aroused much public sentiment. Certain officers in the police department engaged in unrestrained and misleading public statements and antics concerning the guilt of the defendants, and certain elements of the news media capitalized on the sensational aspects of the case. In addition, it is conceded that the police physically tortured one Richard Melville into confessing that he had harbored Portelli in his house on the night of May 19 and into narrating what Portelli had told him at that time. Melville subsequently testified at trial and repeated his conversation with Portelli. This conversation included a statement by Portelli, referring to the proceeds of the robbery, that "Jerry took the rest." This behavior by the police and the news media during the search for and the arrest of the defendants has been soundly condemned by the other courts involved in the case,[3] and we wholeheartedly concur in that condemnation.

Rosenberg makes three claims of constitutional error in his petitions for habeas corpus. He first argues that the testimony of Richard Melville was coerced and that its admission into evidence deprived him of a fair trial. Second, he contends that the atmosphere created by the news media made a fair trial in New York City impossible and that a defense motion for change of venue should have been granted. Finally, he urges that the references to him by Portelli and Dellernia which were admitted through the testimony of Melville, Ferrara, and Miss Manzione deprived him of his right to confront the witnesses against him under the Sixth

---

3. People v. Portelli and Rosenberg, 15 N.Y. 2d 235, 238–239, 257 N.Y.S.2d 931, 205 N.E.2d 857 (1965) ; United States ex rel. Rosenberg v. Mancusi, F.Supp. (WDNY Feb. 2, 1968). See also the reference to Melville's torture in Miranda v. Arizona, 384 U.S. 436, 446, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966).

Amendment as interpreted in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

### I.

We first consider the contention that a change of venue should have been granted. As mentioned earlier, the crime was committed on May 18, 1962. The publicity concerning the crime and the arrest of the defendants lasted for approximately ten days and then died out. The trial began on January 18, 1963, and lasted for a full month. The jury was sequestered from the second day of the trial until the verdict was returned. In addition, from December 8, 1962, until after the trial was ended, all of the major New York newspapers were closed by a strike. Between the initial flurry of news at the time of the crime and the time of the trial, apparently the only publicity about the crime was contained in several detective magazines of limited circulation.

At the voir dire of the jury, each prospective juror and alternate was questioned separately outside of the presence of the other veniremen. Each side was granted a total of thirty peremptory challenges. The twelve jurors and three alternates were finally selected after 109 prospects had been questioned. From the record of the voir dire it appears that there was only one juror who remembered any of the details of the crime. This juror, Mr. Westbrook, stated that he remembered that Rosenberg was alleged to have a prior criminal record, but, upon questioning, he insisted that he could decide the case solely on the basis of evidence adduced at trial. After the court rejected a challenge for cause, the defense failed to exercise what would have been its first peremptory challenge. The remaining jurors only vaguely remembered the case, and indeed no more than what was already apparent from the voir dire.

The question to be considered by us is not whether the police statements or the news coverage at the time of the crime was improper; the impropriety of both is conceded by respondent. We must consider whether Rosenberg was prejudiced at his trial by the adverse publicity. Needless to say, the underlying problem of reconciling a defendant's right to a fair trial with the freedom of the press is a most complex and troublesome one. In addition, the role of the police in fueling inflammatory news coverage creates an even more substantial risk of a denial of a fair trial. See Henslee v. United States, 246 F.2d 190, 193 (5 Cir. 1957), after remand, 262 F.2d 750 (1959), cert. denied, 359 U.S. 984, 79 S.Ct. 942, 3 L.Ed.2d 933 (1959); Myers v. Frye, 401 F.2d 18, 20 (7 Cir. 1968). Not only do official statements engender a greater reliance by the public as to the credibility of the officers making the statements, but they also suggest an official disregard of safeguards inherent in a fair trial.

Rosenberg relies heavily on the landmark cases of Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), and in particular Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). The opinions in *Sheppard* and *Estes* are, of course, very instructive on the dangers of adverse publicity, although both decisions turned on the circus atmosphere created by the publicity *during* the respective trials, a factor which is decidedly absent here. However, time is not discontinuous, and, as shown by *Rideau,* where the adverse publicity occurred two months before trial, *pre-trial* publicity can just as easily deprive a defendant of a fair trial.[4] Therefore, the question in this case is whether under all the circumstances here the temporal separation of the trial from the offending news coverage was in fact sufficient to negate prejudice to the de-

---

4. Likewise, because of the nationwide coverage of certain crimes, of which we have had several examples in recent years, spatial separation from the locus of the crime does not necessarily guarantee isolation from prejudicial news coverage.

fendant. Beck v. Washington, 369 U.S. 541, 555–558, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); United States v. Bowe, 360 F. 2d 1, 11 (2 Cir. 1966), cert. denied, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966) and Collier v. United States, 385 U.S. 1042, 87 S.Ct. 779, 17 L.Ed.2d 686 (1967); Wolfe v. Nash, 313 F.2d 393, 397–398 (8 Cir.), cert. denied, 374 U.S. 817, 83 S.Ct. 1713, ·10 L.Ed.2d 1041 (1963).

■ In this case we are constrained to say that there was sufficient separation. Here, with the exception of Mr. Westbrook, all the jurors only vaguely recalled the news coverage of the case and then no more than what was revealed to them already at the voir dire. See Stroble v. California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952), where the admission at trial of a confession which had improperly been made public beforehand negated any prejudice caused by improper publicity. Mr. Westbrook remembered that Rosenberg had a criminal record but insisted that he could render a verdict on the facts elicited at trial. Defense counsel apparently believed him inasmuch as they did not exercise a peremptory challenge, despite the fact that they had not used any peremptories up to that point. Cf. Beck v. Washington, *supra*, 369 U.S. at 557–558, 82 S.Ct. 955. After impaneling it, the trial judge isolated the jury by sequestration from any remaining news sources in New York which might have covered the trial.

We conclude that the comments set forth in Irvin v. Dowd, 366 U.S. 717, 722–723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961), are particularly apt here:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best quali-

fied to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

## II.

■ Rosenberg's next contention is that he was denied his Sixth Amendment right to confront the witnesses who testified to three statements introduced against his codefendants. As narrated above, Louis Ferrara testified that when Dellernia asked his brother for the keys to his car, Dellernia stated that he needed the car to pick up Rosenberg. Linda Manzione testified that, after she and Dellernia heard gun shots at the tobacco store, Dellernia said, referring to Rosenberg, "He never learns, he never learns." Richard Melville testified that Portelli had told him concerning the proceeds of the robbery, "Jerry took the rest."

Neither Dellernia nor Portelli testified at trial, and although the trial judge made eminently clear to the jury that the statements were admissible only against Dellernia and Portelli respectively,[5] the decision in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), made retroactive in Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968), makes clear that cautionary instructions by the trial judge will not correct the error inherent in the admission of such statements. Hence, there is no doubt that, although the trial judge was acting according to the then applicable constitutional standard, the admission of these statements was error as to Rosenberg.

---

5. Indeed, it may be that these cautionary instructions were overemphasized, thus highlighting the statements.

However, upon the record before us, we find that the error in the admission of these three statements was harmless error. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). Each element of the offense Rosenberg was charged with having committed was overwhelmingly established by other properly admitted evidence, and we can easily conclude beyond a reasonable doubt that Rosenberg would have been convicted by the trial jury without the admission of these statements.[6] Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

### III.

Finally, we consider the effect upon Rosenberg's conviction of Richard Melville's torture at the hands of the police. As stated above, we soundly condemn the tactics used by the police in eliciting information from Melville. We also recognize that Rosenberg is not raising Melville's Fifth Amendment rights but his own right to a fair trial free from coerced testimony, and we readily acknowledge that the use of testimony coerced from a non-defendant witness by the prosecution raises very serious constitutional questions. But here other factors may also be relevant. Melville's torture by the police occurred eight months before the trial, and although Rosenberg poses a strong case for concluding that this coercion carried over to trial, there are complex factual questions as to whether Melville's actual trial testimony was coerced or voluntary. In addition, all the facts concerning the police tactics and any residual effects upon Melville were fully disclosed to the jury.

However, we do not reach a determination of these difficult factual and constitutional problems. Melville's testimony was admitted solely against Portelli, and we have already held above that any error against Rosenberg under

Bruton v. United States, *supra*, is harmless beyond a reasonable doubt. Aside from the remark that "Jerry took the rest," there is no connection between Rosenberg and the testimony which Melville gave at trial. If there were any reversible error stemming from the use of Melville's testimony, it was error as to Portelli and not as to Rosenberg.

We wish to commend Robert Kamenshine, appointed counsel for Rosenberg, for his excellent representation.

The denials of the petitions are affirmed.

HAYS, Circuit Judge (dissenting):

I must respectfully dissent. The case seems to me to be governed by the rule in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and I cannot agree that the evidence against Rosenberg was so overwhelming as to justify application of the harmless error doctrine. I would reverse and direct that the writ be granted unless the state chooses to retry the petitioner.

---

6. As noted previously, both of the Goldberg brothers identified Rosenberg at trial, as did Mrs. Izzo. Also, Ferrara's sunglasses (which Rosenberg had been wearing), Rosenberg's hat, and the peculiarly identifiable ink-stained towel from the tobacco store, which were found in the same trashcan on the way from the tobacco store to Mrs. Izzo's apartment, was strong unchallenged evidence against Rosenberg.